286 N.J. Super. 1 (1995)
668 A.2d 55
STATE OF NEW JERSEY, PLAINTIFF/RESPONDENT,
v.
EDWARD J. GALLAGHER, DEFENDANT/APPELLANT.
Superior Court of New Jersey, Appellate Division.
Submitted October 12, 1995.
Decided November 27, 1995.
*6 Before Judges STERN, WALLACE and NEWMAN.
Susan L. Reisner, Public Defender, attorney for appellant (Frank J. Pugliese, Assistant Deputy Public Defender, of counsel and on the brief).
Deborah T. Poritz, Attorney General of the State of New Jersey, attorney for respondent (Craig V. Zwillman, Deputy Attorney General, of counsel and on the brief).
The opinion of the court was delivered by WALLACE, J.A.D.
Defendant was found guilty of aggravated sexual assault by anal penetration in violation of N.J.S.A. 2C:14-2a (count one); aggravated sexual assault by vaginal penetration while armed with a weapon in violation in N.J.S.A. 2C:14-2a (count two); criminal restraint in violation of N.J.S.A. 2C:13-2 (count three); terroristic threats in violation of N.J.S.A. 2C:12-3a and/or 12-3b (count four); possession of a handgun for an unlawful purpose in violation of N.J.S.A. 2C:39-4a (count five); and robbery in violation of N.J.S.A. 2C:15-1 (count seven). At the conclusion of the State's case, the trial court dismissed the possession of an imitation firearm for an unlawful purpose in count six. The trial court sentenced defendant on count one to a twenty year term with a ten year parole disqualifier; on count two to a consecutive twenty year term with a ten year parole disqualifier; on count three to a concurrent five year term; on count four to a concurrent five year term; on count five to a concurrent ten year term; and on count seven to a consecutive twenty year term with a ten year parole disqualifier. The trial court also imposed VCCB penalties totaling *7 $20,120. Defendant's aggregate sentence was sixty years in prison with a thirty year parole disqualifier.
In his brief on appeal defendant makes the following contentions.
POINT I:
THE TRIAL COURT DEPRIVED DEFENDANT OF HIS FEDERAL AND STATE CONSTITUTIONAL RIGHTS TO A FAIR TRIAL AND DUE PROCESS OF LAW BY FAILING TO SUBMIT THE LESSER INCLUDED OFFENSES OF AGGRAVATED SEXUAL ASSAULT TO THE JURY, AND BY ERRONEOUSLY INSTRUCTING THE JURY THAT "INSERTION OF THE PENIS INTO THE CREVICE FORMED BY THE LEFT AND RIGHT BUTTOCKS TO ANY DEGREE ... WOULD CONSTITUTE PENETRATION FOR PURPOSES" OF FIRST DEGREE SEXUAL ASSAULT. (U.S. CONST., AMENDS. VI, XIV; N.J. CONST., ART. I, PARS. 1, 9, 10).
POINT II:
THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY ADMITTING INTO EVIDENCE THE IMPERMISSIBLY SUGGESTIVE OUT-OF-COURT VOICE IDENTIFICATION AND THE TAINTED IN-COURT VOICE IDENTIFICATION OF THE DEFENDANT BY THE VICTIM, AND THUS DENIED HIM HIS RIGHT TO A FAIR TRIAL UNDER THE UNITED STATES AND NEW JERSEY CONSTITUTIONS. (U.S. CONST., AMENDS. VI, XIV; N.J. CONST., ART. I, PAR. 10).
POINT III:
THE VERDICT IS AGAINST THE WEIGHT OF THE EVIDENCE, AND VIOLATES THE DUE PROCESS CLAUSE OF THE FIFTH AND FOURTEENTH AMENDMENTS.
A. THE IDENTITY OF DEFENDANT AS THE ASSAILANT IN THIS CASE WAS NOT ESTABLISHED BEYOND A REASONABLE DOUBT.
B. THE EVIDENCE RELATING TO COUNT ONE OF THE INDICTMENT WAS INSUFFICIENT TO SUPPORT A FINDING THAT DEFENDANT COMMITTED AN ACT OF ANAL PENETRATION UPON THE VICTIM WITH HIS PENIS.
POINT IV:
THE COURT ABUSED ITS DISCRETION BY IMPOSING MAXIMUM TERMS AND BY ORDERING CONSECUTIVE SENTENCES ON COUNTS ONE, TWO AND SEVEN. ADDITIONALLY THE COURT ABUSED ITS DISCRETION BY ORDERING THE MAXIMUM V.C.C.B. PENALTIES ON COUNTS ONE AND TWO.
A. THE MAXIMUM TERMS IN THIS CASE ARE MANIFESTLY EXCESSIVE.
B. THE THREE CONSECUTIVE SENTENCES ARE NOT SUPPORTED WITH ANY REASONS AND CAN NOT BE JUSTIFIED.

*8 C. THE MAXIMUM FINES ON COUNTS ONE AND TWO ARE MANIFESTLY EXCESSIVE.
We hold that the jury charge on aggravated sexual assault by anal penetration was erroneous, that lesser included offenses to aggravated sexual assault by anal penetration should have been charged, that the court failed to give reasons for imposing consecutive sentences, and that it was an abuse of discretion to impose an aggregate VCCB penalty of $20,120. In all other respects, we affirm defendant's judgment of conviction.
The jury could reasonably have found from the evidence that on October 17, 1991, around 8:20 p.m., M.M., a twenty-two year old woman, left a health club in Pequannock to get into her car. As she put her key into the door lock, she saw a man wearing a stocking mask approach her with a gun. The man was wearing faded blue jeans and a navy blue hooded sweatshirt. The man warned M.M. that if she moved or screamed he would blow her brains out. He then took her by her left arm and pushed her into the adjacent woods which were dense and full of pricker bushes. M.M. told him she could not go any further. The man put his hand over her mouth. M.M. noticed his hands were white and thin with long fingernails. She also detected a very foul odor.
M.M. asked the man what he wanted. He said that he was taking her hostage because the police suspected him of committing a robbery and had impounded his truck by the lake. M.M. continued to ask the man questions even after he threatened to kill her. She could not see his face but listened very carefully to his voice so she could hopefully identify it later. The man continued to hold the gun to her left side. He then took her to a masonry plant in a secluded area. The man tied her wrists behind her back with wire or plastic and put tape over her eyes and mouth. The tape was not very sticky because M.M. could see by looking down, and the tape loosened as she began to speak.
The man led her to another area and stood behind M.M. to push her up an embankment. M.M. climbed over a fence and cut her leg. The man told M.M. that if she said anything about this he *9 would kill her parents, tie her up, and force her to watch him having sex with her two sisters. At a certain point the man stopped M.M., cut her hands loose, and took her clothes off. The man ordered her to get on her knees, but M.M. refused. He then told her to lean forward and attempted anal penetration. M.M. kept moving forward and would tense up to prevent penetration. M.M. said that the man became frustrated and pulled his pants up.
The assailant then placed M.M.'s jacket on the ground and ordered her to lay face down on her jacket. M.M. said she was laying on her stomach when the man inserted a bottle of hair spray into her vagina. He had apparently discovered the bottle of hair spray among the contents of her pocketbook which he had dumped on the ground. He told her to count to 200. M.M. heard him leave. After counting to 100, M.M. got up, and noticed that her bra, underwear, socks, and pocketbook with $30 were missing. She was not sure whether the $30 consisted of three ten dollar bills or a twenty dollar bill, a five dollar bill, and five one dollar bills.
She gathered her remaining belongings and made her way back to the health club parking lot. There she encountered a spa employee, James Kayal. She told Kayal of the assault. Kayal drove M.M. home where she met her girlfriend who accompanied her to the Pequannock police station. M.M. provided details of the attack to Patrolman Louis Behrens at or about 9:30 p.m. She described her attacker as being about five feet nine inches tall weighing between 140 and 160 pounds. She said he was wearing faded blue jeans, which were frayed at the bottom, and a navy blue hooded sweatshirt. M.M. described the man's voice as being "very lethargic" and "lower class, uneducated."
Around 9:45 p.m. the police transported M.M. back to the scene. Along the path leading to the scene of the assault, Behrens found a piece of adhesive tape, a hair spray bottle, and an aspirin container. M.M. was later taken back to the police station where she was interviewed by Detective Catherine Fenske of the Morris County Prosecutor's office. M.M. was then transported to the *10 hospital. After consulting with her supervisor, Fenske decided that no rape test kit should be performed because of the limited physical contact between M.M. and the attacker. The doctor examined M.M.'s anal and vaginal area and reported no abnormalities or bruises in her vaginal vault and no evidence of contusions on the buttocks or evidence of any rectal tears.
At approximately 10:00 p.m. on October 17, Patrolman Paul Rusiniak was in the police station when defendant entered and said he was looking for Behrens, his stepfather, regarding the location of his truck. Defendant asked Rusiniak what was happening at Woodland Lake. At that point, Rusiniak was unaware of the sexual assault that occurred near that location and replied nothing. Defendant stated that he was in the park earlier that night with a male he met there for the first time, and they saw flashing lights near the masonry building. Defendant stated that when the other man saw the lights he told defendant that "they must be looking for us." Rusiniak called Detective Angelo Troiano and told him that defendant might have some information about a crime committed at Woodland Lake.
Troiano met with defendant. Defendant told Troiano that he was riding his bicycle when a man approached and began talking. Defendant again stated that the man commented that the police must be looking for them. At that point Troiano informed defendant he would contact him if he needed him.
Between the night of the assault and the time of his arrest, defendant had several contacts with the police. On the morning of October 18, Lieutenant William Montano and Detective Daniel Balunis went to interview defendant at a gas station located about 300 yards from the scene of the assault. Defendant's truck had been parked there for several months. When they arrived, defendant was sitting against the tailgate of his truck wearing a dark blue hooded sweatshirt. Defendant voluntarily returned to the police station where his statement regarding the stranger at Woodland Lake Park was videotaped.
*11 Montano drove the defendant back to his truck. Montano then searched the area where the assault took place. During part of this search, defendant followed Montano and pointed out the spot where he had met the man the night before. Approximately ten feet from that spot, Montano discovered a blue Avon eye liner pencil, which M.M. later identified as hers.
That same evening defendant was brought back to the station by the police. Montano advised defendant of his Miranda rights at 7:45 p.m. Defendant waived his rights and gave a statement. At some point, Montano confiscated $29 from defendant, consisting of two ten dollar bills, one five dollar bill, and four one dollar bills. During the interview, defendant expressed that there had been an attempted or actual rape of a girl on the night of October 17 near Woodland Lake. He said he saw a female detective take the victim to the hospital to "look for somebody's sperm or something like that." Defendant said the money he had was the remainder of fifty dollars he had earned two weeks before while working for a carpenter. At or about 11:30 p.m. Montano executed a search warrant of defendant's pickup truck. The police found two pairs of blue jeans, one of which fit the victim's description of the faded and frayed blue jeans worn by the assailant, a pair of brown work boots, two blue hooded sweatshirts, and a box of flex cuffs.
On the morning of October 21, Montano picked defendant up at his truck and drove him to the Morris County Prosecutor's office. Detective Barry Arigo read defendant his rights and defendant agreed to be interviewed. At one point defendant asked Arigo "why was a gun used in this?". When Arigo asked him how he knew that a gun had been used, defendant did not respond. Defendant was also asked to give a voice exemplary. He recited two nursery rhymes on a tape cassette. At the conclusion of the interview defendant was arrested and charged with the crimes committed against M.M.
The next day, after Detective Loughman had prepared a voice identification line-up, M.M. listened to the voices in the line-up. *12 When defendant's voice came on, M.M. appeared uneasy and disturbed by the voice. She identified defendant's voice as that of her assailant. At trial, M.M. also identified defendant's voice as that of her assailant.
Defendant did not testify. He called several witnesses. Detective Thomas Paradiso testified that he had examined various pieces of evidence, including the tape used to cover M.M.'s mouth. The one fingerprint found on the tape did not match defendant's fingerprints. Other experts testified that no blood or hairs were found on defendant's clothing submitted for testing.

I
Defendant contends that the trial court erred in instructing the jury with respect to the definition of penetration on count one. Further, he contends that this erroneous instruction precluded the trial court from instructing the jury on lesser included offenses such as attempted aggravated sexual assault, aggravated criminal sexual contact, and criminal sexual contact. We are convinced that the trial court erred in defining penetration and should have charged lesser included offenses.
A person is guilty of aggravated sexual assault if he or she "commits an act of sexual penetration" under certain circumstances, such as during the commission of a robbery or while armed with a weapon. N.J.S.A. 2C:14-2a(3) and (4). Sexual penetration is defined as "vaginal intercourse, cunnilingus, fellatio or anal intercourse between persons or insertion of the hand, finger or object into the anus or vagina either by the actor or upon the actor's instruction. The depth of insertion shall not be relevant as to the question of commission of the crime[.]" N.J.S.A. 2C:14-1c. In contrast, aggravated criminal sexual contact occurs when a person "commits an act of sexual contact" under any of the circumstances listed in N.J.S.A. 2C:14-2a. N.J.S.A. 2C:14-3. Sexual contact is defined as "an intentional touching by the victim or actor, either directly or through clothing, of the victim's or actor's intimate parts...." N.J.S.A. 2C:14-1d. "`Intimate parts' *13 means the following body parts: sexual organs, genital area, anal area, inner thigh, groin, buttock or breast of a person[.]" N.J.S.A. 2C:14-1e. In construing the terms contained in N.J.S.A. 2C:14-1, the court should employ their "ordinary and well understood meaning." State v. Fraction, 206 N.J. Super. 532, 535, 503 A.2d 336 (App.Div. 1985), certif. denied, 104 N.J. 434, 517 A.2d 426 (1986).
We begin with the "basic tenet of statutory construction that penal statutes are to be strictly construed in favor of the accused. Nevertheless, the construction must conform to the intent of the Legislature." In re M.T.S., 129 N.J. 422, 431, 609 A.2d 1266 (1992). A plain reading of the definition of penetration dictates that touching the buttocks or slightly penetrating between the two cheeks does not constitute anal penetration. While the depth of insertion is not relevant, there must be an insertion "into the anus" in order to prove penetration. N.J.S.A. 2C:14-1c.
In the present case, the trial court charged the jury on count one that "insertion of the penis into the crevice formed by the left and right buttocks to any degree" constituted penetration. This was error. Anal intercourse requires penetration, however slight, into the anus. See State v. Fraction, supra, 206 N.J. Super. at 536, 503 A.2d 336. While insertion of the penis between the left and right buttocks may be sufficient to prove sexual contact in that there is a touching of the victim's intimate part, it is not sufficient to prove anal intercourse.
Defendant also urges that the trial court erred in failing to charge lesser included offenses of aggravated sexual assault. We agree with this contention. A defendant "is entitled to a charge on all lesser included offenses supported by the evidence." State v. Short, 131 N.J. 47, 53, 618 A.2d 316 (1993). Moreover, the trial court should charge a lesser included offense when the evidence would warrant a conviction for that offense even if the defendant does not request the charge. See State v. Clarke, 198 N.J. Super. 219, 224, 486 A.2d 935 (App.Div. 1985). We are satisfied that the *14 evidence presented "a rational basis on which the jury could acquit the defendant of the greater charge and convict defendant of [a] lesser." State v. Brent, 137 N.J. 107, 117, 644 A.2d 583 (1994).
Here, the jury could have convicted defendant of attempted aggravated sexual assault by finding that defendant intended to engage in anal penetration during the commission of a robbery, but did not succeed in penetrating M.M. N.J.S.A. 2C:14-2a and N.J.S.A. 2C:1-8d. Further, the evidence adduced at trial could have supported a conviction for attempted sexual assault if the jury found that defendant intended to engage in anal penetration with M.M. but failed to complete the act. N.J.S.A. 2C:14-2c(1). Also, the jury could have convicted defendant of aggravated criminal sexual contact by determining that defendant intentionally touched M.M.'s buttocks with his penis during the commission of a robbery, but did not intend anal penetration. N.J.S.A. 2C:14-3a. Finally, the jury could have found defendant guilty of criminal sexual contact by concluding that defendant intentionally touched M.M.'s buttocks with his penis, but not during the commission of the robbery. N.J.S.A. 2C:14-3b.
As a general rule, when a conviction for the greater offense is vacated for failure to charge the jury on the lesser included offense, the State can request that the court sentence the defendant for the lesser included offense in lieu of a new trial, if the jury verdict "constitutes a finding that all the elements of a lesser included offense have been properly established and no prejudice to the defendant will result." State v. Hauser, 147 N.J. Super. 221, 228, 371 A.2d 89 (App.Div.), certif. denied, 75 N.J. 27, 28, 379 A.2d 258 (1977); State v. Alexander, 215 N.J. Super. 522, 531, 522 A.2d 464 (App.Div. 1987). Here, the State urges that we order that a judgment of conviction be entered on the lesser included offense of attempted aggravated assault. In our view, that is not appropriate in this case because we do not know which lesser included offense the jury might find defendant committed.
Moreover, after careful review of the record, we are satisfied that there was insufficient evidence to submit the issue of anal *15 penetration under count one to the jury, and therefore the charge of aggravated sexual assault must be dismissed. M.M. at first testified that defendant touched the outside of her buttocks with his penis but did not penetrate between the crevice. The next day M.M. testified that she had misunderstood some of the questions posed to her about the assault. In response to the prosecutor's comment to tell what happened with respect to the attempted sodomy, M.M. replied:
[a]s [defendant] told me to lean forward, he  I felt himself press up against me in which I was so tense that he did not enter  there was no anal penetration, but there was penetration against my buttocks.
The evidence is clear that the defendant did not penetrate the victim's anus with his penis. As penetration is a necessary element for a conviction of aggravated sexual assault by anal penetration, the failure to prove penetration is fatal to that charge. Consequently, we reverse defendant's conviction of aggravated sexual assault by anal penetration under count one. If the State seeks to retry defendant under count one, it may proceed only on the lesser included offenses.

II
We turn now to defendant's argument that the voice identification procedure was impermissibly suggestive and denied him due process. Further, defendant contends that the out of court identification tainted the in-court voice identification of the defendant by the victim. We disagree. In our view the voice identification procedure was not impermissibly suggestive.
The constitutional safeguards that apply to visual identifications also apply to voice identifications. State v. Clausell, 121 N.J. 298, 328, 580 A.2d 221 (1990); State v. Johnson, 138 N.J. Super. 579, 351 A.2d 787 (App.Div.), certif. denied, 71 N.J. 340, 364 A.2d 1072 (1976). A "voice identification is inadmissible if its reliability is outweighed by the suggestiveness of the identification procedure." "Reliability depends on such factors as the witness's opportunity to hear the accused and the consistency with prior *16 voice identifications." State v. Clausell, supra, 121 N.J. at 328, 580 A.2d 221. In other words, the witness must have an adequate basis for comparing defendant's voice with the voice he or she identified as the voice of the assailant. State v. Johnson, supra, 138 N.J. Super. at 582, 351 A.2d 787.
A two step analysis must be applied to determine the admissibility of M.M.'s voice identification of defendant. State v. Madison, 109 N.J. 223, 232-33, 536 A.2d 254 (1988). In Madison, our Supreme Court noted:
a court must first decide whether the procedure in question was in fact impermissibly suggestive. If the court does find the procedure impermissibly suggestive, it must then decide whether the objectionable procedure resulted in a "very substantial likelihood of irreparable misidentification." Simmons v. United States, supra, 390 U.S. [377] at 384, 88 S.Ct. [967] at 971, 19 L.Ed.2d [1247] at 1253 [(1968)]; accord Neil v. Biggers, supra, 409 U.S. [188] at 199-201, 93 S.Ct. [375] at 382-383, 34 L.Ed.2d [401] at 411 [(1972)]; Stovall v. Denno, supra, 388 U.S. [293] at 302, 87 S.Ct. [1967] at 1972, 18 L.Ed.2d [1199] at 1206 [(1967)]. In carrying out the second part of the analysis, the court will focus on the reliability of the identification. If the court finds that the identification is reliable despite the impermissibly suggestive nature of the procedure, the identification may be admitted into evidence. "Reliability is the linchpin in determining the admissibility of identification testimony...." Manson v. Brathwaite, supra, 432 U.S. [98] at 114, 97 S.Ct. [2243] at 2253, 53 L.Ed.2d [140] at 154 [(1977)]. The reliability determination is to be made from the totality of the circumstances adduced in the particular case. Neil v. Biggers, supra, 409 U.S. at 199, 93 S.Ct. at 382, 34 L.Ed.2d at 411.
[State v. Madison, supra, 109 N.J. at 232-33, 536 A.2d 254].
A review of several cases is helpful. In Clausell, our Supreme Court held that the totality of the circumstances indicated that the suggestive identification was unreliable. Clausell, supra, 121 N.J. at 328-29, 580 A.2d 221. The only voice identification occurred in the courtroom and the defendant was the only person who spoke. Ibid. Defendant spoke the words that the perpetrator spoke on the night the crime was committed and twenty months had elapsed between the commission of the crime and the in-court identification. Id. at 329, 580 A.2d 221. The witness only heard the perpetrator speak two words on the night when the crime was committed and her in-court identification was not bolstered by any pretrial voice identification. Ibid. Finally, although the witness *17 identified his voice as the voice of the perpetrator, she testified that there was nothing distinct about the defendant's voice. Ibid.
In State v. Johnson, supra, 138 N.J. Super. at 585, 351 A.2d 787, the court concluded that the victim's voice identification was reliable because the assailant carried on a conversation with the victim for a half hour before, during, and after the sexual assault. Further, the victim was alert, gave an accurate description of defendant's voice, and made a positive identification the day after the attack at a voice "show-up" at police headquarters. Id. at 584, 351 A.2d 787.
In United States v. Schultz, 698 F.2d 365 (8th Cir.1983), a pretrial voice lineup occurred that was similar to the procedure used in the case at bar. The defendant alleged that the recording of his voice sounded halting and uneducated with an accent while the voices of the five FBI agents who participated in the lineup sounded educated and highly trained. Id. at 367. The court stated that the difference in accent and vocal style was not so pronounced as to result in impermissible suggestiveness, but the discrepancy in volume and sound resolution when defendant's voice was played did amount to impermissible suggestiveness. Id. at 367-68. Nevertheless, the court found that the in-court identification was admissible because the witnesses paid careful attention to the extortionist's voice even though they only heard it for a short period of time, neither witness equivocated in the identification of defendant even though neither provided a description of the extortionist's voice prior to trial, and the three months that elapsed between the crime and the lineup did not render the identifications unreliable. Id. at 368.
In United States v. Patton, 721 F.2d 159, 162-63 (6th Cir.1983), the court found that the in-court voice identification was admissible because the witness received threats on four separate occasions, the fact that she could repeat the threats demonstrated a high level of concentration, and her exposure to defendant's voice during the pretrial lineup was minimal. Further, only three weeks elapsed between the commission of the crime and the *18 pretrial lineup. In addition, upon hearing defendant's voice the witness "immediately recoiled" indicating a familiarity with the voice from the four threatening phone calls. Id. at 162.
In United States v. Duran, 4 F.3d 800, 803 (9th Cir.1993), cert. denied, ___ U.S. ___, 114 S.Ct. 894, 127 L.Ed.2d 87 (1994), the court held that an in-court voice identification was reliable because the witnesses who were bank tellers had a sufficient opportunity to hear the bank robber who shouted several commands and threats, the tellers were most likely quite attentive due to the presence of a weapon accompanied by threats, they provided accurate descriptions of defendant's distinctive voice, and neither witness equivocated in her identification of defendant.
In the instant matter, at a pretrial hearing held on the issue of M.M.'s voice identification of defendant, Loughman testified that after listening to defendant's voice on a tape, he selected people he concluded had voices similar to defendants. The voice array contained six voices, including defendant's, who each recited identical nursery rhymes. Prior to playing the tape for M.M., Loughman told her that she would be listening to tapes of nursery rhymes recited by six different voices, that "one of them may or may not be the voice of the assailant," and that after listening to all the voices she should advise him if she could "recognize anyone specifically." After listening to the voices on the tapes, M.M. replied "number four, that's the one, I'll never forget that voice." Number four was the voice of the defendant. The trial court listened to the tapes. The court found that several voices sounded similar to defendant's voice and concluded that the voice lineup "does not give rise to any suggestibility." We are satisfied there was sufficient credible evidence in the record for the trial court to reach this conclusion. State v. Johnson, 42 N.J. 146, 161-62, 199 A.2d 809 (1964).
Even if we were to conclude the out-of court identification procedure was impermissibly suggestive, we would still conclude that the voice identification was reliable. M.M. had ample opportunity to listen to her attacker's voice because she engaged him in *19 conversation by asking him questions. She said she intently listened to his voice hoping that she could later identify him. Further, she described her attacker's voice to the police and the pretrial voice identification occurred only a few days after the incident. Moreover, M.M. never equivocated in her identification of defendant's voice as the voice of the assailant. Under the totality of circumstances, we are satisfied that there was no substantial likelihood of misidentification in M.M.'s identification of defendant's voice, both out-of court and in-court.

III
Defendant next contends that the verdict was against the weight of the evidence because the State failed to prove the identity of defendant as the assailant beyond a reasonable doubt and failed to prove he committed aggravated sexual assault by anal penetration. We previously expressed our agreement with defendant's contention that the State failed to prove anal penetration. However, we find no basis to support defendant's claim that there was insufficient evidence to conclude that defendant was the perpetrator of the crimes and therefore the remaining verdicts were against the weight of the evidence. There was ample evidence linking the defendant to the crimes. M.M.'s description of her attacker's fingernails as long and his hands as white, thin, dirty and emitting a foul odor matched the observations of defendant by the police officers. M.M. identified ties found in defendant's truck as similar to those used to bind her hands. She also identified a blue hooded sweatshirt and pair of blue jeans found in defendant's truck as the clothing worn by her assailant.
Furthermore, the assailant had taken thirty dollars from M.M.'s pocketbook, consisting of either three ten dollar bills or a twenty dollar bill, a five dollar bill, and five single dollar bills. On October 18, 1991 Montano confiscated twenty nine dollars from defendant, consisting of two ten dollar bills, one five dollar bill and four one dollar bills. Further, in defendant's various statements to the police, he insisted that he left the Pequannock library at *20 8:55 p.m. on October 17, but a librarian testified that he could not have been there that late.
More importantly, M.M. identified defendant's voice both out of court and in court, as the voice of her assailant. If believed, the witnesses presented by the State provided overwhelming evidence of defendant's guilt. The evaluation of the credibility of the witnesses is the function of the jury. State v. Brown, 118 N.J. 595, 618, 573 A.2d 886 (1990). Consequently, we find no cause to conclude that the jury's verdict constituted a miscarriage of justice under the law. R. 2:10-1; State v. Sims, 65 N.J. 359, 373-74, 322 A.2d 809 (1974).

IV
Defendant's final argument pertains to his sentence. He contends that his sentence is excessive, both with respect to the length of the prison terms and the Violent Crimes Compensation Board penalties imposed, and that the trial court violated the consecutive sentencing guidelines set forth in State v. Yarbough, 100 N.J. 627, 498 A.2d 1239 (1985), certif. denied, 475 U.S. 1014, 106 S.Ct. 1193, 89 L.Ed.2d 308 (1986).
We find no sound basis to disturb the trial court's findings of five aggravating factors and no mitigating factors. There is ample support in the record for the conclusion that the crimes were committed in an especially heinous, cruel or depraved manner. N.J.S.A. 2C:44-1a(1). As pointed out previously, the victim was abducted at gunpoint, her hands tied behind her back, her eyes and mouth taped, and she was taken to an isolated area and sexually assaulted. To be sure, the defendant's use of a gun was an element of the aggravated sexual assault. However, considering all of the circumstances, we do not regard the trial court's reference to defendant's use of a gun as improper double counting. The court also cited the gravity and seriousness of harm. N.J.S.A. 2C:44-1a(2). The court noted that the victim was rendered "substantially incapable of exercising [her] normal physical *21 or mental power of resistance." Undoubtedly, the court was also influenced by the victim's comment at sentencing that she carries "constant pain of self-degradation" and that she "will always be a prisoner of fear," in reaching its finding. Even if this finding is error, we would regard the court's error as harmless. The court further determined that there was a substantial risk of future recidivism as evidenced in part by defendant's lengthy history of criminal activity. N.J.S.A. 2C:44-1a(3), (6) and (9). The evidence supports the court's finding in that regard and its conclusion that there were no mitigating factors. See State v. Roth, 95 N.J. 334, 365-66, 471 A.2d 370 (1984).
When the aggravating factors preponderate over the mitigating factors, the trial court may impose a sentence higher than the presumptive term. See State v. Kruse, 105 N.J. 354, 358, 521 A.2d 836 (1987). Although not expressly noted by the court, it obviously concluded that the aggravating factors substantially outweighed the non-existent mitigating factors to impose a maximum sentence of twenty years and a ten-year period of parole ineligibility. N.J.S.A. 2C:43-6b. We affirm the sentence imposed on counts two, three, four, five and seven.
Defendant also urges that the trial court abused its discretion in the imposition of consecutive sentences. Specifically he contends that the court failed to give any statement of reasons for the imposition of consecutive terms. The State argues that the consecutive sentences did not violate the guidelines set forth in State v. Yarbough, supra, 100 N.J. 627, 498 A.2d 1239.
N.J.S.A. 2C:44-5a expressly gives the sentencing court discretion to impose consecutive sentences. In Yarbough, supra, 100 N.J. 627, 498 A.2d 1239, the Supreme Court noted that "in fashioning consecutive or concurrent sentences under the Code, sentencing courts should be guided by the Code's paramount sentencing goals that punishment fit the crime, not the criminal...." Id. at 630, 498 A.2d 1239. Specifically the Court stated the following criteria should be considered:

*22 (1) there can be no free crimes in a system for which the punishment shall fit the crime;
(2) the reasons for imposing either a consecutive or concurrent sentence should be separately stated in the sentencing decision;
(3) some reasons to be considered by the sentencing court should include facts relating to the crimes, including whether or not:
(a) the crimes and their objectives were predominantly independent of each other;
(b) the crimes involved separate acts of violence or threats of violence;
(c) the crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior;
(d) any of the crimes involved multiple victims;
(e) the convictions for which the sentences are to be imposed are numerous;
(4) there should be no double counting of aggravating factors;
(5) successive terms for the same offense should not ordinarily be equal to the punishment for the first offense; and
(6) there should be an overall outer limit on the cumulation of consecutive sentences for multiple offenses not to exceed the sum of the longest terms (including an extended term, if eligible) that could be imposed for the two most serious offenses.

Id. at 643-44, 498 A.2d 1239.
We are unable to discern from the record the analysis used by the trial court because it failed to give reasons for imposing consecutive sentences. Consequently, we remand for the trial court to articulate reasons for imposing either consecutive or concurrent sentences.[1]
Finally, defendant urges that the maximum Violation Crimes Compensation Board (VCCB) penalties imposed on counts one and two are manifestly excessive because the trial court failed to consider defendant's present ability to pay those penalties.
N.J.S.A. 2C:43-3.1a(1) provides in pertinent part:

*23 any person convicted of a crime of violence ... shall be assessed at least $100.00, but not to exceed $10,000.00 for each such crime for which he was convicted which resulted in the injury or death of another person. In imposing this assessment, the court shall consider factors such as the severity of the crime, the defendant's criminal record, defendant's ability to pay and the economic impact of the assessment on defendant's dependents.
In State v. Pindale, 249 N.J. Super. 266, 289, 592 A.2d 300 (App. Div. 1991), we noted that the trial court should have expressed its reasons for imposing VCCB penalties of $2,500 on defendant's three manslaughter convictions, even though the penalties were within the permissible range.
Here, the trial court did not set forth its reasons for imposing the maximum penalty of $10,000 on counts one and two. The only comment the trial court made was that defendant might come into a substantial amount of money in the future that would enable him to pay the penalties which the court acknowledged he could not currently pay. In our view, that was not enough. If that reason were deemed sufficient, the imposition of the maximum penalty could be justified in every crime of violence. There must be some relationship between defendant's ability to pay over the course of his incarceration and parole, and the actual VCCB penalty imposed. See State v. Newman, 132 N.J. 159, 169, 623 A.2d 1355 (1993) (before imposing a fine or restitution the court must determine if defendant will be able to pay it). We reverse the imposition of the maximum VCCB penalty and remand for reconsideration.

V
In sum, the conviction on counts two, three, four, five and seven are affirmed. We reverse the conviction of aggravated sexual assault in count one and dismiss that charge. If the matter is retried, the State may proceed on attempted aggravated assault and the lesser included offenses of count one, but not on aggravated sexual assault. We remand for reconsideration of the imposition of consecutive sentences and the amount of the VCCB penalty, *24 which should await the result of any retrial. We do not retain jurisdiction.
NOTES
[1] The Legislature amended N.J.S.A. 2C:44-5 to provide that the sentencing judge may impose any number of consecutive sentences. This will affect some of the factors delineated in Yarbough, supra, 100 N.J. 627, 498 A.2d 1239 (1985). The amendment became effective August 5, 1993. The crimes here were committed in 1991. Both the State and defendant urge that the Yarbough factors apply. We agree.