**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0463-16T3

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

DAWAN INGRAM,

     Defendant-Appellant.

_____

Submitted December 20, 2018 – Decided April 12, 2019

Before Judges Simonelli, Whipple and DeAlmeida.

On appeal from Superior Court of New Jersey, Law Division, Essex County, Indictment No. 14-03-0827.

Joseph E. Krakora, Public Defender, attorney for appellant (Joshua D. Sanders, Assistant Deputy Public Defender, of counsel and on the brief).

Theodore Stephens II, Acting Essex County Prosecutor, attorney for respondent (Tiffany M. Russo, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

Appellant filed a pro se supplemental brief.

PER CURIAM

Defendant Dawan Ingram appeals from an August 9, 2016 judgment of conviction for the murder of Najee Montague on a Newark street corner. Three people witnessed Montague's shooting and identified defendant as the shooter. A jury convicted defendant of: first-degree murder, N.J.S.A. 2C:11-3(a)(1) and (2); second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b); and second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a). We affirm defendant's conviction but remand to address sentencing error.

We discern the following facts from the trial record. On September 21, 2013, around 7:35 p.m., police officers responded to a disturbance at Salem Street and South Orange Avenue in Newark. When officers arrived, Montague was lying on the ground. D.H.,[1] Montague's friend, had been inside a bodega on the corner just moments before the shooting. D.H. did not see the shooter's face. When D.H. was trying to help Montague, a bystander either showed him where the shooter dropped the gun or handed the gun to D.H. D.H. took the gun, ran down the street, and hid it in a backyard garage. He did not mention the gun to police at the scene. Two days later, the police brought D.H. to the police station for an interview.

_____

[1] We use initials to protect the identity of the eyewitnesses.

A-0463-16T3

Detective Tyrone Crawley created a photo array and handed it to Detective Murad Muhammad to show D.H. Muhammad administered the identification and the process was recorded. D.H. recognized the men in two photos. When D.H. selected photo four, Muhammad asked "what did he do?" to which D.H. responded, "[h]e . . . supposedly shot my man[.]" Crawley entered the room after D.H. made the identification, but D.H. refused to sign anything confirming his identification. Instead, Crawley marked which photo D.H. identified. At trial, D.H. testified he signed a letter stating he felt police pressured him into selecting defendant's photo. Muhammad denied coercing D.H. into making an identification.

The day after D.H. identified defendant as the shooter, he led Crawley to where he hid the gun on Salem Street. Two live rounds were recovered from the gun that were consistent with those recovered from the scene of the shooting.

H.J., who was also Montague's friend, was talking with him on the street corner before the shooting. The police brought H.J. to the police station to provide an identification. Crawley created the photo array and handed it to Detective Eric Manns. The process was recorded.

H.J. selected defendant's photo as the shooter. Manns testified H.J. appeared nervous but not under the influence of alcohol or drugs and was able

3

to understand everything Manns said to him. At trial, H.J. testified he was very drunk and high when he identified defendant and denied signing his name on the form acknowledging his identification. H.J. also claimed not to recognize himself in the video. On the witness stand, H.J. testified he remembered nothing about the shooting or his identification and that he did not know defendant.

L.P., a registered nurse, often ran errands on the street corner where Montague was shot. On the day Montague was murdered, she saw two men conversing in front of the bodega when she suddenly heard a "pop" and saw Montague fall to the ground. The shooter was standing about eight feet away from her and, in court, she identified defendant as the shooter.

L.P. approached Montague and tried to help him. When the police arrived, she gave them an alias. Later, L.P. explained she used this alias because she did not want to get involved in the matter and used the alias to apply for credit cards.

The police took L.P. to the police station to provide a statement. When asked whether she could identify the shooter, she said it was possible, but when shown a group of photos, she did not make an identification. L.P. signed her alias on the statement.

Two months later, police again asked L.P. to try to identify the shooter from an array of photos. Manns again administered the identification and L.P.

4

identified defendant as the shooter.  She denied receiving any suggestion or pressure to select defendant's photo.  During her testimony, she explained she originally used an alias to avoid involvement but ultimately decided to give her real name when asked to make a second identification.

Prior to trial, defendant moved to suppress all three identifications. Defendant argued the detectives did not follow the Attorney General's guidelines in preparing and conducting the photo lineups because the detectives did not ask certain prefatory questions, such as whether the witnesses talked with co-witnesses prior to making the identification.  The trial judge found no indicia of suggestiveness and declined to grant defendant a Wade[2] hearing.

The trial began on June 1, 2016.  All three identification videos were played for the jury.  State witnesses included H.J., L.P., D.H., Crawley, Manns and other officers, as well as ballistics expert Luke Laterza.  Defense witnesses included defendant's mother and other alibi witnesses.  After the jury convicted defendant on all counts, on August 5, 2016, the judge sentenced him to a fifty-year term for the murder charge, with an eighty-five percent parole ineligibility term pursuant to the No Early Release Act, N.J.S.A. 2C:43-7.2.  The weapons convictions were merged for sentencing purposes, and defendant received a

---

[2] United States v. Wade, 388 U.S. 218 (1967).

A-0463-16T3

concurrent ten-year term, with five years parole ineligibility. A $500 Violent

Crimes Compensation Board (V.C.C.B.) fine was also levied as punishment for

the murder conviction. This appeal followed.

Through counsel, defendant raises the following points on appeal:

POINT I

BECAUSE THE IDENTIFICATIONS OF MR. INGRAM WERE THE PRODUCT OF IMPERMISSIBLY SUGGESTIVE SYSTEM VARIABLES THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY ADMITTING THE IDENTIFICATIONS INTO EVIDENCE WITHOUT FIRST PROPERLY DETERMINING THEIR RELIABILITY.

POINT II

THE COURT VIOLATED MR. INGRAM'S RIGHTS TO DUE PROCESS AND A FAIR TRIAL BY ADMITTING "EXPERT" BALLISTICS TESTIMONY THAT IS CONTRARY TO THE CURRENT STATE OF THE SCIENCE AND FEDERAL LAW AND IS THEREFORE UNRELIABLE AND INADMISSIBLE UNDER [N.J.R.E.] 702.

A. Subjective Ballistics Toolmark Evidence Is Inadmissible Under [N.J.R.E.] 702 As It Is Unreliable.

B. Alternatively, This Court Should Remand The Matter For A [Rule] 104 Hearing As To The Scientific Reliability Of This Evidence, If Any.

6

POINT III

THE SENTENCING COURT ERRONEOUSLY
ANALYZED THE AGGRAVATING AND
MITIGATING FACTORS AND IMPOSED AN
EXCESSIVE SENTENCE. (Not Raised Below).

A.    The Trial Court Erred In Imposing, Without
      Explanation, A $500 V.C.C.B. Fine For the
      Murder.

B.    The Trial Court Erred In Finding Aggravating
      Factor One.

C.    The Trial Court Erred In Finding Aggravating
      Factor Two.

Defendant, in a pro se supplemental brief, raises the following points:

POINT 1

A JUROR OVERHEARD THE ALLEGED WITNESS
[H.J.] IN THE BATHROOM HAVING A
CONVERSATION WITH SOMEONE WHILE ON A
CELLULAR PHONE.

POINT 2

DEFENDANT/APPELLANT WAS DENIED THE
EFFECTIVE ASSISTANCE OF COUNSEL AT
TRIAL.

POINT 3

TRIAL COURT ERRED IN ALLOWING
DEFENDANT/APPELLANT'S PAROLE OFFICER
TO TESTIFY AS WHETHER OR NOT
DEFENDANT/APPELLANT WAS HOME BECAUSE

7

HER TESTIMONY DEPENDED SOLELY ON AN ANKLE MONITOR THAT WAS NOT PRESERVED IN EVIDENCE OR PRESENTED TO THE JURY AND WAS QUESTIONABLE TO BE WORKING AROUND THE TIME OF THE INCIDENT.

POINT 4

DEFENDANT/APPELLANT WAS DENIED A FAIR TRIAL, BECAUSE PROSECUTION KNOWINGLY USED PERJURED TESTIMONY, THAT MAY HAVE DERIVED FROM WITNESS BEING THREATENED WITH PERJURY AND OR OTHER CRIMINAL CHARGES AFTER SHE LIED TO DETECTIVES ABOUT WHO SHE WAS UNDER OATH AND ADMITTED THAT SHE COMMITTED FRAUD.

POINT 5

THE TRIAL COURT ERRED IN PERMITTING THE STATE TO COMMENT ON FACTS NOT SHOWN OR REASONABLY INFERRED FROM THE EVIDENCE IN THE CASE WHICH PREJUDICED THE DEFENDANT/APPELLANT.

POINT 6

PROSECUTION [INADVERTENTLY] OR INTENTIONALLY [WITHHELD] INTERROGATION VIDEO FROM OCTOBER 1ST, 2013 OF WHEN DEFENDANT WAS QUESTIONED AND CHARGED FOR THE CRIMES HE WAS CONVICTED OF WHICH CONTAINED POSSIBLE EXCULPATORY EVIDENCE.

A-0463-16T3

POINT 7

TRIAL COURT ABUSED THEIR DISCRETION IN OVERRULING AN OBJECTION BY THE DEFENSE COUNSEL AND ALLOWING A POLICE OFFICER TO TESTIFY IN A GROSS[3] HEARING TO DETERMINE THE RELIABILITY OF A VIDEO OF A PHOTO LINEUP THAT HE WAS NOT PHYSICALLY IN THE ROOM TO WITNESS.

I.

On appeal, defendant argues the judge abused her discretion by admitting video of the out-of-court identifications. He argues D.H.'s identification was impermissibly suggestive because the police allegedly told D.H. whom to identify beforehand, Muhammad did not ask D.H. whether he spoke with anyone about the identification prior to making it, and Muhammed did not conduct the identification in a double-blind fashion. Defendant also suggests L.P. was coerced to identify him because the police learned of her alias and used it as leverage. Finally, he asserts H.J.'s identification was inadmissible because a different officer than who administrated the identification was permitted, during the Gross hearing, to view H.J.'s video identification even though the officer was not present for the photo identification. We disagree as to all points.

---

[3] State v. Gross, 121 N.J. 1 (1990).

A-0463-16T3

A trial court should suppress an out-of-court identification if the defendant can prove "a 'very substantial likelihood of irreparable misidentification.'" State v. Henderson, 208 N.J. 208, 238 (2011) (quoting State v. Madison, 109 N.J. 223, 232 (1988)), modified on other grounds, State v. Anthony, __ N.J. __ (2019). To obtain a Wade hearing, a defendant must make a preliminary showing of "'some evidence of suggestiveness' in the identification procedure." State v. Pressley, 232 N.J. 587, 596 (2018) (quoting Henderson, 208 N.J. at 288-89). Suggestiveness can be proven through the presence of system variables, or those circumstances of an identification within the State's control. Henderson, 208 N.J. at 248. System variable include: (1) whether a "blind" or "double-blind" administrator is used; (2) whether pre-identification instructions are given; (3) whether the lineup is constructed of a sufficient number of fillers that look like the suspect; (4) whether the witness is given feedback before, during or after the procedure; (5) whether the witness's confidence level was recorded before any confirmatory feedback was given; (6) whether the witness is exposed to multiple viewings of the subject; (7) whether a "showup" was used; (8) whether the administrator asked the witness if he or she had spoken with anyone about the identification; and (9) whether the eyewitness initially made no choice or chose a different suspect or filler. Id. at 289-91. If this threshold showing is made,

A-0463-16T3

the State must demonstrate the identification is reliable "accounting for system and estimator variables." Id. at 289. The ultimate burden to prove "a very substantial likelihood of irreparable misidentification" remains with the defendant at all times. Ibid.

Here, the judge did not abuse her discretion by denying defendant's Wade motion seeking to suppress D.H.'s and L.P.'s identifications. She properly observed a hearing was only required upon a showing of some evidence of impermissible suggestiveness. The judge also properly bifurcated the analysis and first considered whether the identification procedure itself was unduly suggestive. Thus, upon finding no evidence of suggestiveness, the judge did not need to consider whether estimator variables were present.

In particular, there was nothing suggestive about L.P.'s delay in identifying defendant. The judge expressed a willingness to consider this argument under Rule 104 before L.P. testified at trial. But when the time came, defendant made no objection, and L.P. testified unimpeded.

We also reject defendant's suggestion that D.H. was coerced into selecting defendant's photo. That argument is directly contradicted by D.H.'s statement, "[h]e . . . supposedly shot my man[.]" after Officer Muhammad asked why he selected defendant's photo. Whether the account of the identification D.H. gave

on the stand was to be believed was a credibility question for the jury. As for the argument L.P.'s identification was coerced because the police knew she used an alias, her identification was, like D.H.'s, a matter of credibility rather than admissibility, and it was fully aired for the jury at trial.

During the Gross hearing regarding H.J.'s identification of defendant, defense counsel objected to Detective Rashaan Johnson's testimony about the video because he was not present for the photo identification. The judge overruled the objection. The transcript reveals Officer Johnson did not testify about the photo identification or anything else outside his personal knowledge. Thus, we discern no abuse of the court's discretion in permitting him to observe and testify about the video during the Gross hearing.

II.

We also reject defendant's newly-minted argument that the expert testimony concerning the murder weapon should have been excluded. Defendant did not object to the expert's testimony at trial. Therefore, we review for plain error. R. 2:10-2; State v. Nesbitt, 185 N.J. 504, 516 (2006).

Nine shell casings were recovered at the scene and two live rounds were found in the gun D.H. hid on Salem Street. Luke Laterza, the head firearms

examiner at the Newark Police Ballistics Laboratory, testified to identify the firearm and ammunition.

Laterza identified the firearm retrieved from D.H. as a "nine-millimeter [Sturm] Ruger semi-automatic pistol"[4] and observed the live rounds were stamped by the name of their manufacturer, Speer. The nine shell casings were also made by Speer for a nine-millimeter Luger firearm. Each time a round is discharged, the gun's firing pin or breech face makes an imprint on the cartridge case. Laterza opined the imprints on all nine shell casings were identical. Thus, Laterza concluded all nine rounds were "in fact" fired from the same firearm. When compared to the markings made by the firearm recovered, Laterza concluded the bullets were fired from the gun D.H. led police to retrieve.

Defendant argues Laterza's opinion was subjective and not supported by objective, reliable, and scientific analysis.[5] Defendant seeks, as a general

---

[4] The transcripts use "Luger" and "Ruger" interchangeably when describing the firearm. Neither party has indicated this is a meaningful difference.

[5] Firearm toolmark identification is performed by conducting a side-by-side comparison of a cartridge case from a round found in the firearm versus cartridge casings found at the scene. The examiner uses a comparison microscope to visually compare the markings on the cartridge case found in the weapon versus those found at the scene. If the markings match, the examiner opines the cartridge casings found at the scene were fired from the recovered firearm. Defendant argues such an assessment is subjective (because it is a visual

matter, a re-examination of firearm toolmark identification expert testimony. Defendant's chief argument is that firearm toolmark experts should not be permitted to testify with certainty the bullet casings found at the scene were fired from the gun examined. He points out the expert has no way to rule out that the bullet was not fired from a different, identical gun. Although at least one federal court has discussed this issue, United States v. Willock, 696 F. Supp. 2d 536 (D. Md. 2010), no New Jersey court has addressed it, and we need not address it here.[6] Here, D.H. testified the shooter dropped the gun at the scene, D.H. acquired it, and he turned it over to police. Accordingly, there is little doubt the State's expert examined the gun used in the shooting.

---

examination) and does not account for class or subclass characteristics. Class characteristics, in the firearms context, are those markings unique to a make and model of a particular firearm or ammunition. Nat'l Research Council, Strengthening Forensic Science in the United States: A Path Forward 152 (2009). What a visual examination cannot rule out is the possibility that the cartridge casings recovered at the scene possess the same class or subclass characteristics as the firearm under examination but were fired from a different firearm of the same make and model. This prevents the expert from assigning a probability or error rate to the examination because it is entirely subjective and therefore, in defendant's opinion, unreliable.

[6] The expert testimony in this case was admitted before our Supreme Court explained the federal Daubert standard should be incorporated by New Jersey courts to assess the admissibility of expert testimony. In re Accutane Litig., 234 N.J. 340, 348, 398 (2018) (discussing Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993)).

A-0463-16T3

III.

Also, for the first time on appeal, defendant argues the trial court erred by not giving curative instructions after two juror irregularities, the State needed to prove his ankle bracelet was functioning before his probation officer could testify, the prosecutor's statements during summation constituted misconduct, and he was deprived of effective assistance of counsel. We review for plain error. None of the arguments have merit.[7]

During a break in testimony, Juror Two reported to a court officer that while he was in the bathroom, he overheard a man on a phone telling someone, "I don't know why they're calling me. I don't know anything." The man also said "don't worry, we've been together a long time. I know you a long time, so don't worry. I know nothing." When asked whether he could continue to be fair and impartial, Juror Two believed he could not. Juror Two said he "could listen to the facts," but what he overheard tainted his view of "the witness," because he could not believe "how someone could forget so easily a[n] experience like

---

[7] Defendant also alleges the prosecutor withheld an exculpatory video recording of when the police brought defendant in for questioning. Defendant fails to point us to any place in the record where this allegation is substantiated. Therefore, we decline to review it.

A-0463-16T3

this."[8]  The trial judge excused Juror Two and questioned the rest of the jury. All but one remaining juror said Juror Two started to tell the group what he overheard, but they stopped him and informed the court.  None of the remaining jurors said Juror Two told them anything that would affect their ability to be impartial.

During the trial, Juror One informed the judge the Essex County Prosecutor's Office executed a search warrant at her son's house in an unrelated case.  She said this would not affect her ability to be impartial but added the search was a surprise to her, and she was unsure whether it would decrease her focus on the trial.  After a discussion with counsel, the trial court did not dismiss Juror One but instructed her to let the court know if her concentration was diminished.

On appeal, defendant argues the trial judge should have given a curative instruction after both juror incidents.  We discern no abuse of discretion. "Ultimately, the trial court is in the best position to determine whether the jury has been tainted."  State v. R.D., 169 N.J. 551, 559 (2001).  "The trial court must use appropriate discretion to determine whether the individual juror, or jurors, 'are capable of fulfilling their duty to judge the facts in an impartial and unbiased

---

[8]  Juror Two presumed the man on the phone was H.J.

A-0463-16T3

manner, based strictly on the evidence presented in court.'" Id. at 558 (quoting State v. Bey, 112 N.J. 45, 87 (1988)). Curative instructions are necessary to mitigate potential prejudice swept into the trial by inadmissible evidence. State v. Rivera, 437 N.J. Super. 434, 461 (App. Div. 2014).

The trial judge dismissed Juror Two, and she voir dired remaining jurors and reminded them of their duty to be impartial, which was effectively a curative instruction. Juror One was instructed to inform the court if she felt she could not continue, and she felt she could continue to be impartial. No further curative steps were necessary.

Next, defendant argues the trial judge should not have permitted defendant's probation officer to testify about his electronic curfew. Police were alerted to the murder at approximately 7:35 p.m. Defendant's mother testified defendant was at home with her at 7:25 p.m. In rebuttal, the State called defendant's parole officer. Defendant was wearing an electronic monitoring device that registered when defendant entered and exited through the front door of his mother's apartment. Defendant's probation officer testified her logs reflected that defendant returned home at 7:45 p.m.

The trial court conducted a Rule 104 hearing on the admissibility of the parole officer's testimony and ruled the probative value of defendant's location

17

was not outweighed by the prejudicial fact he was on parole. Defendant argues the testimony should have been excluded because the State did not present the ankle bracelet to the jury to prove it functioned.

"[A] trial court's evidentiary rulings are 'entitled to deference absent a showing of an abuse of discretion, i.e., there has been a clear error of judgment.'" State v. Harris, 209 N.J. 431, 439 (2012) (alteration in original) (quoting State v. Brown, 170 N.J. 138, 147 (2001)). We will reverse an evidentiary ruling only where "there has been a clear error of judgment" that resulted in "a manifest denial of justice[.]" State v. J.A.C., 210 N.J. 281, 295 (2012) (quoting Brown, 170 N.J. at 147).

We detect no abuse of discretion in admitting the probation officer's testimony. Whether the probation officer was more or less credible because she did not produce the ankle bracelet was for the jury to decide.

Next, defendant contends the prosecutor committed misconduct during summation by commenting on facts outside the evidence when he suggested D.H. lied when he denied knowing defendant. Defendant also takes issue with the prosecutor's argument that defendant had time to commit the murder and return home by 7:45 p.m.

18

The prosecutor's duty to achieve justice does not forbid a prosecutor from presenting the State's case in a "vigorous and forceful" manner. State v. Ramseur, 106 N.J. 123, 320 (1987) (quoting State v. Buchanis, 26 N.J. 45, 56 (1958)). However, closing statements must be confined to "comments [regarding] evidence revealed during the trial and reasonable inferences to be drawn from that evidence." State v. Reddish, 181 N.J. 553, 641 (2004) (quoting State v. Smith, 167 N.J. 158, 177 (2001)). During closing argument, a prosecutor may not: "make inaccurate legal or factual assertions," State v. Frost, 158 N.J. 76, 85 (1999), make an argument contrary to the facts or reference evidence the court has ruled inadmissible, State v. Ross, 249 N.J. Super. 246, 250 (App. Div. 1991), or "express a personal belief or opinion as to the truthfulness of his or her witness's testimony." State v. Staples, 263 N.J. Super. 602, 605 (App. Div. 1993).

The prosecutor's comments herein did not rise to the level of misconduct. It was up to the jury to determine whether to believe D.H.'s identification or his in-court testimony where he recanted. The prosecutor was permitted to suggest the jury infer D.H. was lying on the stand. Moreover, the jury was free to infer how fast defendant was driving because the State presented time-stamped

19

security footage showing defendant driving away from the scene with enough time to return home by 7:45 p.m.

Next, defendant argues he was denied effective assistance of counsel but does not offer a reason why his trial counsel's performance fell below an acceptable standard. "Our courts have expressed a general policy against entertaining ineffective-assistance-of-counsel claims on direct appeal because such claims involve allegations and evidence that lie outside the trial record." State v. Preciose, 129 N.J. 451, 460 (1992). But we acknowledge a "defendant should not be required to wait until post-conviction relief to raise the issue [if] the trial record discloses the facts essential to his ineffective assistance claim." State v. Allah, 170 N.J. 269, 285 (2002). Because defendant does not explain how his trial counsel was ineffective, we cannot review his claim.

IV.

Finally, defendant was sentenced to a fifty-year term and assessed a $500 V.C.C.B. penalty on the murder conviction. He argues the sentence was premised on an erroneous finding of aggravating factors one and two. Defendant also contests the V.C.C.B. penalty as excessive. We affirm the sentence, but reverse the V.C.C.B. fine and remand for the judge to address the amount of the fine.

The trial judge found defendant's act to be "especially heinous, cruel and depraved" because defendant shot the victim, who was among a group of bystanders on a busy street corner, seven times, including three times in the back. However, the judge made no explicit finding of aggravating factor one, and defendant now argues the judge relied on the heinous nature of defendant's acts for sentencing purposes. The trial judge did make an explicit finding of aggravating factor two. The judge considered Montague to be vulnerable because defendant shot him in the back without provocation. Defendant argues this was error because Montague did not lack the capacities of a typical adult and was not restrained or previously wounded. However, N.J.S.A. 2C:44-1(a)(2), "does not limit 'vulnerability' to age or other physical disabilities of the victim. It expressly includes 'any other reason' that renders the victim 'substantially incapable of exercising normal physical or mental power of resistance.'" State v. O'Donnell, 117 N.J. 210, 218-219 (1989) (quoting N.J.S.A. 2C:44-1(a)(2)). We discern no abuse of the court's discretion in her application of sentencing factors.

N.J.S.A. 2C:43-3.1(a)(1) required the trial judge to assess defendant a fine of "at least $100.00, but not to exceed $10,000.00" for his murder conviction. In State v. Gallagher, we explained when a court imposes a higher penalty than

the statutory minimum, the court must demonstrate "some relationship between [the] defendant's ability to pay over the course of his incarceration and parole, and the actual [V.C.C.B.] penalty imposed." 286 N.J. Super. 1, 23 (App. Div. 1995). Necessarily, this finding must be made on the record. State v. Swint, 328 N.J. Super. 236, 264 (App. Div. 2000). Here, the trial court assessed a $500 V.C.C.B. fine without giving a corresponding reason why a departure from the statutory minimum was warranted. We remand for the trial judge to make the required findings or correct the amount of the fine.

Defendant's conviction is affirmed and the matter is remanded for resentencing consistent with this opinion.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION