# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2238-21

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

D.F.W.,[1]

     Defendant-Appellant.

_____

> Submitted October 2, 2024 – Decided October 29, 2024
>
> Before Judges Mayer and Rose.
>
> On appeal from the Superior Court of New Jersey, Law Division, Camden County, Indictment No. 20-01-0101.
>
> Jennifer Nicole Selletti, Public Defender, attorney for appellant (John P. Flynn, Assistant Deputy Public Defender, of counsel and on the briefs).
>
> Grace C. MacAulay, Camden County Prosecutor, attorney for respondent (Maura M. Sullivan, Assistant Prosecutor, of counsel and on the brief).

---

[1] We refer to defendant, the minor victim, and the victim's family by their initials. R. 1:38-3(c)(9) and (12).

Appellant filed a pro se supplemental brief.

PER CURIAM

Defendant D.F.W. appeals from a February 15, 2022 judgment of conviction for sexually assaulting his stepdaughter, J.H., and other related offenses. In the alternative, he argues the trial court improperly double-counted elements of the offense in applying aggravating factor one, N.J.S.A. 2C:44-1(a)(1). We affirm the convictions and sentence.

We recite the facts from the trial testimony. In the fall of 2017, J.H. was fourteen years old and lived with her mother, C.W., two younger sisters, K.H. and J.W., and defendant. J.H.'s mother worked two different jobs—a day job and an overnight job. Because C.W. worked outside the home, defendant cared for the girls.

On November 28, 2017, while at school, K.H. told some classmates about an "inappropriate" incident between J.H. and defendant when C.W. was not home. One of K.H.'s classmates told a teacher. The teacher reported the statement to the school's administrative staff. The school's administrative staff contacted the Division of Child Protection and Permanency (Division).

A-2238-21

The same day, the Division visited J.H.'s home. A Division case worker first spoke with K.H. and then spoke to J.H. The case worker included C.W. in the conversation. J.H. revealed defendant sexually assaulted her.

After speaking with the Division's case worker, J.H., her two younger sisters, and her mother were interviewed at the Camden County Prosecutor's Office (CCPO). At the CCPO, J.H. spoke to a detective about defendant's sexual assaults. J.H.'s trial testimony about defendant's sexual abuse mirrored her statements to the detective. We summarize J.H.'s statements to the CCPO detective.

J.H. stated the first time something occurred between her and defendant was when she was between eleven and twelve years old. According to J.H., the assault occurred on a June afternoon when she and her two sisters were home with defendant and her mother was at work. J.H. said the sisters decided to play doctor and defendant indicated he wanted to play too.

Defendant then told J.H. that because she was the "oldest," she would be the first "patient." Defendant led J.H. to the marital bedroom. J.H.'s sisters remained in their bedroom. When J.H. entered the marital bedroom, defendant instructed J.H. to remove her clothes. Defendant left the room and closed the door. J.H. did as defendant requested but did not remove her undergarments.

When defendant returned to the marital bedroom, he instructed J.H. to take off her underwear and bra. Defendant again left the marital bedroom while J.H. removed those garments. J.H. stated she was afraid that if she did not do as she was told, she would "get whooped."

Shortly thereafter, defendant reentered the marital bedroom, removed his pants, and began touching J.H. According to J.H., defendant grabbed her wrist, told her to place her hand on his penis and move her hand "up and down." J.H. tried to pull her hand away, but defendant held her wrist.

J.H. estimated the incident lasted "three minutes." When it was over, she dressed and left the marital bedroom. According to J.H., a "few hours" after this incident, she told K.H. what had happened because her sister "asked." K.H. was seven years old at the time.

J.H. stated she spoke to K.H. approximately "five" more times about incidents between her and defendant. Each time, J.H. became emotional. However, J.H. never told C.W. about the incidents. J.H. explained she did not disclose the incidents to her mother because C.W. and defendant argued frequently, "were already going through their own stuff," and J.H. "didn't want to make it worse."

A-2238-21

The second incident between J.H. and defendant occurred about one month after the first incident. J.H. was twelve years old at the time. On that day, J.H. went into the marital bedroom because she wanted to play video games. The video games were available only on her parents' bedroom television.

Defendant was on the telephone when J.H. entered the marital bedroom. While on the phone, defendant touched J.H. "on the top of [her] boobs." When defendant got off the telephone, he "touched [her] boobs again and then he touched [her] vagina." Defendant told J.H. to close the door and take off her clothes. Once J.H. was naked, defendant "continued to touch [her] vagina" and pulled out his penis. J.H. "put [her] mouth on [his penis]" and "a white substance" discharged from defendant's penis. After, J.H. grabbed her clothes and dressed. She then went into the bathroom to spit in the toilet. After the second incident, J.H. estimated defendant put his penis in her mouth about "forty" times between 2015 and 2017.

J.H. also told the detective that when she was between thirteen and fourteen years old, defendant would assault her at least "three days out of the week" and, as time went on, the assaults were more "frequent" and "more extreme." J.H. also stated that, when she was fourteen, defendant's penis would

5

touch her anus "a few times," with defendant using "Vaseline" or "slippery stuff." At that time, J.H. testified the assaults happened "four days" a week.

Defendant's last sexual assault of J.H. took place on Thanksgiving 2017. J.H. stated she was in the kitchen, cleaning up after dinner, when defendant came up behind her and put his hands "under [her] shirt and on [her] boobs." J.H. walked away, went to her bedroom, dressed in her pajamas, and tried to sleep. Because she was unable to sleep, J.H. went into the living room where defendant sat watching television.

J.H. explained she "wasn't allowed to sit on the couch," so she sat on the floor. To avoid "ruin[ing her] eyes," J.H. sat further away from the television and between defendant's legs. Defendant then touched her, both over and under her clothes. J.H. said her clothes were removed and defendant retrieved a blue towel,[2] which he placed on the living room floor. Defendant told J.H. to lie on the towel. Defendant then undressed and placed J.H. on "all fours." While she was on all fours, defendant started "running his penis . . . underneath [her] vagina" and "kept feeling [her] boobs." At that point, K.H. entered the living room, complaining she was sick. Defendant yelled at K.H. to return to her

---

[2] J.H. explained defendant used the same blue towel during prior sexual assaults.

 A-2238-21

bedroom and K.H. complied. Defendant then told J.H. to go into the marital bedroom. J.H. did as she was told but dressed first.

Defendant, still naked, followed J.H. into the marital bedroom, and placed the same blue towel on the floor. However, this time defendant laid on the towel and told J.H. to put her mouth on his penis.

Defendant resumed touching J.H., and she said her clothes came off. J.H. moved to all fours and a "white substance" discharged from defendant's penis. J.H. said some of the substance went "on the blue towel," "on [her] back," and "on the floor." Following this incident, J.H. showered and placed her clothes in the hamper. J.H. placed her underwear near the bottom of the hamper because she did not want her mother "to see it."

J.H.'s interview with the CCPO detective lasted about one hour. The CCPO detective then took statements from C.W. and J.H.'s two sisters.

Following the interviews, the CCPO filed charges against defendant. Defendant turned himself in the same day. The CCPO detective spoke with the defendant, who denied the allegations. The detective also obtained a buccal swab sample from defendant.

After her interview at the CCPO, J.H. went to the local hospital where she was examined by a sexual assault nurse examiner. The nurse could not complete

7

the examination because J.H. became "[in]consolable and began thrashing around" when the nurse attempted to obtain a cervical swab. As part of the examination, the nurse noted J.H. had no physical injuries.

On December 1, 2017, Dr. Martin A. Finkle, who provided expert testimony for the State at defendant's trial, examined J.H. Dr. Finkle was the "founder and medical director of the CARES Institute."[3] He described the CARES Institute's function as follows:

> [The] CARES Institute is a diagnostic and treatment center for children w[h]ere there is concern that they might be experienc[ing] any and all forms of child maltreatment. And we combine the medical and mental health so we have a mental health component, [which] is mostly [sic] strongly focus[ed] on evidence-based research to develop evidence-based treatment for children who are experiencing sexual victimization in all forms of child maltreatment.
>
> And of course [the] primary impact of maltreatment when it is substantiated [is] psychological, so mental health is important. And . . . I am the pediatrician, I do the medical component.

Dr. Finkle explained his process for examining patients. First, he speaks to the child's parents and then to the child. He notes the child's medical history,

---

[3] The doctor explained CARES stands for "child abuse research, education, and service."

particularly as described by the child, because "ninety percent of the diagnosis is in what the child has to say."

In describing his examination of J.H., Dr. Finkle testified J.H. told him about the first time something happened between her and defendant. She provided details regarding defendant's sexual abuse, which Dr. Finkle reported as part of his trial testimony. According to Dr. Finkle, J.H. said the sexual contact between her and defendant "happened both ways," meaning genital and anal, and occurred more than once per week. J.H. further told Dr. Finkle about the "sensations" she felt after the sexual contact, such as "burn[ing]," "runny bowels," and difficulty walking and urinating. J.H. also reported "some bleeding." J.H. also described other sex acts specifically, fellatio, which she told Dr. Finkle happened "about one time a week."

J.H. disclosed the following concerns to Dr. Finkle during the pre-examination discussions: what would happen to her mother and sisters as a result of her disclosing defendant's sexual abuse; whether she might suffer any diseases due to the sexual assaults; and would she be able to have children in the future. Dr. Finkle addressed these concerns and discussed other mental health issues with J.H.

9

After the interview, Dr. Finkle physically examined J.H. with her mother present in the examination room. Dr. Finkle reported "any injuries that [J.H.] complained [of] . . . had . . . since healed."

After interviewing J.H., CCPO investigators searched the family's home and seized several items. A few days after this search, C.W. called the CCPO investigators to report she collected additional items that might have evidentiary value. The collected items included a blue towel, blanket, and J.H.'s underwear. C.W. placed all three items in the same bag and delivered them to the CCPO. CCPO detectives, in turn, sent the underwear for testing "because . . . that was the item . . . most likely to provide biological evidence." J.H.'s underwear tested positive for sperm and blood. The sperm contained defendant's DNA.

At trial, J.H. and C.W. testified they received letters and telephone calls from defendant while he was in jail. During these conversations, defendant discussed the allegations against him. The jury heard portions of these telephone calls recorded by the jail facility and read along with a transcript of the calls.[4]

---

[4] For security purposes, inmates' telephone communications are recorded by the prison facility.

A-2238-21

The trial judge redacted portions of the telephone conversations and letters. Defendant challenged the judge's redactions. Thus, we recite large portions of defendant's communications for context.

In a December 23, 2017 telephone call, defendant told an unidentified listener, "I'm trying to get it to where I might be able to persuade [someone] to get my daughter, and [C.W], and my other daughter to recant what they said."

In a December 26, 2017 telephone call, defendant made the following remarks to C.W.:

> Trust what I'm telling you. You don't know what I – you don't know about this system. I do. What you say could change things around if you really wanted to have something to say. What you say could be very, very critical in [the] decision that the prosecutor has just decided to make. I'm telling you what I know. If you want to go (inaudible).
>
>    . . . .
>
> <u>I will say things did happen here and there</u>. But all that time, and all that stuff, no. All the stuff that was said, no. I can honestly tell you that, [C.W.], that all that stuff did not happen. Everything I'm being charged with, accused of, is not true.
>
> [(Emphasis added).]

On the same date, in another recorded telephone conversation between defendant and C.W., the following exchange occurred:

11

[C.W.]: For how long?

DEFENDANT: <u>It's been going on over like the past year</u>, but it has not been –

[C.W.]: Over the last year. We've been married for a year.

DEFENDANT: It wasn't going on before we got married, [C.W.]. Nothing was going on before we got married, nothing. Nothing. I wouldn't sit here and lie to you like that. I haven't lied to you about so much stuff. Why would I start lying to you now? Do you understand what I'm saying to you?

[(Emphasis added).]

The next day, defendant placed another telephone call to C.W. The following exchange took place:

DEFENDANT: You said so what happened?

[C.W.]: Mm-hmm.

DEFENDANT: You have to ask me that? All right; fine. You want to know? <u>There was touching and that was that. There was touching. There was (inaudible). There were other things involved</u>. Ain't nothing (inaudible). I ain't gonna say another thing. There was another thing involved.

[(Emphasis added).]

Defendant also sent a December 27, 2017 letter to C.W. and her daughters. Directing a portion of the letter to J.H. specifically, defendant wrote:

12 

[P]lease, please forgive me. I never, ever meant to hurt you in the way that I have. Please forgive me for being the first man/dad to break your heart. I know you hate me and probably don't want to read nor hear anything that I have to say. However, please listen carefully, very carefully. <u>I first of all want to apologize to you for my wrong behavior. I wish I would have protected you better. It was all of my fault that this unfortunate abuse happened to you caused by me</u>. You are not to blame and I do not want you to think that it was your fault at all. <u>If I could change the way things happened, then you would have never known what it feels like to be hurt nor have to deal with what you have to go through now</u>. [J.H.], I apologize and regret everything that has happened negatively to you.

. . . .

Though I cannot change anything that has happened in the past, I hope that every day you become stronger to be able to overcome what has happened and move on with your life successfully. Please do not blame your mother for anything because it was not her fault and she did her best in protecting you. <u>Daddy made some awful bad decisions</u> and not your mother so love her, [J.H.]. Mommy cares about you. I love you tomorrow for always and for life, love supreme, daddy. P.S. hopefully one day you will accept my sincere apology and forgive me. I never meant to hurt you. Please forgive me.

[(Emphasis added).]

Addressing K.H. in the same letter, defendant wrote:

[D]addy loves you and wants you to know that doing what you did by telling someone was a good thing to do in trying to protect your big sister. You did not

13

do anything wrong and I hope that you forgive daddy for having to make you feel unsafe at home. <u>Daddy did something very bad</u>. [K.H.], I apologize for not being there for you as I should be. I will love you always, [K.H.]. I love you today, tomorrow, and forever always, love supreme, daddy.

[(Emphasis added).]

In a January 8, 2018 letter to C.W, defendant wrote:

Peace beautiful. [C.W.], listen, I know that me being completely away from you is extremely a lot to deal with especially when it comes to the care and concern of our girls. I know that it's not an easy task and I know that to a degree it's struggle having to deal with them completely on your own. I know it's not easy to deal with the worries and stress of trying to maintain the home, handle our kids and take care of the bills all by self [sic] without having your soul mate and husband to aid and assist and being your better half to hold you down just as I was previously doing. I love the fact that you are at least willing to give us another chance even over the fact of you telling me that you don't want to be in a relationship with me again, which to a point I can understand yet on another degree I don't fully see why you wouldn't want to.

[C.W.], I need you to read and reread this portion of this letter carefully. <u>I was building with you on there being a way that you can get me home if you really want me home</u>. There was [sic] some things that I wanted to build with you on; however, I didn't want to build on the jock with you on the specifics. As I was telling you on the jock, <u>you literally have the power and decision of what happens to me when it comes to my life and freedom</u>, the requirements of what would have to be done are rural as I said before and you would have to

be very affirm and strong within your choice to make such a critical decision.  The decision would also require the involvement of [J.H.] being strong enough to make one hell of a choice.  Overall, you would have the final say in the whole ordeal.

If you want me home here is what would have to be done.  I feel awkward about sharing this with you and even a little crazy for penning these thoughts given the circumstances.  I hope this information stays exclusively between us and us only whether you follow through with these thoughts or not.

[F]or me to get home, [C.W.], you and [J.H.] would have to totally withdraw yourselves from the case altogether, meaning that you would have to go before the judge and tell him or her that you want absolutely nothing to do with the case at all.  I would also need for you to write a sworn affidavit in admitting that you and your daughter want nothing to do with the case at hand.  You would without a doubt have to be very strong in making your decision to do this if you would even consider doing this at all.  The state's attorney and prosecutor would be all but nice, but when it would come to them inquiring as to why you wish to withdraw from the case and they would definitely ask you if the defendant/me has at all been in contact with you at any time.  Basically, you would really have to have my back to the fullest and not appear in court at any of my hearings after you withdraw from the case.

First and foremost, before anything you would have to really have a one-on-one talk with [J.H.] seriously and explain to her how you feel.  This would benefit us as a family.  Her decision even before your [sic] comes first, so if it's a no-go, then it's a no-go, period.  I would never ask you to do anything that would compromise the wealth and safety of our seeds,

15

and by all means if you chose to do this, then I would most definitely want you to be okay in knowing that I wouldn't ever hurt my see[d]s, and beyond that the fact that I can be trusted beyond the shadow of a doubt. The whole process would not take as long as it would if we had to keep going back and forth to court because without a witness to testify to the charges in the case then the state doesn't have a case. Therefore, the court has to drop the charges or find my case to be voided meaning that they would hold me for a little bit more time. However, in between that time if you don't appear then they would have to release me.

[C.W.], please forgive me if you feel at all disrespected by the notions that I just explained and presented to you. I didn't and I don't mean to be inconsiderate or ignorant and I hope that this is not how you feel, baby. In all honestly and truth this is technically the only other option and way for me to come home and the only way for us to avoid having to deal with the system, period. The decision is totally up to you on whether or not you would want to go through the process or just leave everything as it already is and just wait to see what the overall outcome will be.

If having me come home was an option, then there would still be stipulations set in place and I would definitely want us to go to family counseling immediately. I would of course still have to find self a motel to stay in for a while and I would have to find employment plus do counseling sessions on my own. I would be willing to do whatever you ask of me no matter how hard a task, even if that meant the humiliation of comforting people for real.

[C.W.], please know that it is not a plan that is a way of me looking for a way out at all. It's just really a matter of me not wanting to be completely torn away

16

A-2238-21

from my family, which is none other than you and my girls.

In closing, please take what's being said into consideration and don't think anything ill-mannered on what I wrote about. It's only a suggestion. The decision is always yours to do whatever you will. I'm in love with my baby, [C.W.], for life. Thank you so much for being here with me. Love, your husband, [defendant].

[(Emphasis added).]

Defendant placed additional telephone calls to C.W. on January 16, 2018.

During these conversations, the following exchanges occurred:

[C.W.]: What is not true?

DEFENDANT: The fact that stuff been going on since they've been twelve years old, all that stuff. And then even –

[C.W.]: And all that dope?

DEFENDANT: Even the fact that it's on my whatcha call it that I forced. <u>There was never no force of anything. There was never no force of nothing at all</u>. No coercing, no any of that.

     . . . .

[C.W.]: That it was consensual? Is that what you told them?

DEFENDANT: <u>Yes</u>.

[C.W.]: She wanted it as much as you did.

DEFENDANT: No, I'm not, I'm not saying that, but the way things happened I mean technically -- technically to a degree, I can say to a degree they knew what was going down. If that makes any sense to you.

. . . .

[C.W.]: (Inaudible) it wasn't the regular way. It was the back way. You understand what I'm saying?

. . . .

DEFENDANT: So, basically you're saying that insertion from behind.

[C.W.]: What?

DEFENDANT: Insert, insert. You know what that means, right? Insert.

[C.W.]: Put it (inaudible).

DEFENDANT: What?! Wow! That's what you were told?

[C.W.]: (Inaudible).

DEFENDANT: Whoa. So, wait a minute. Then I'm going to be doing -- wait a minute. Wait a minute. Wait a minute. Wait a minute. You're basically saying that it was said that I was sticking my dick in her ass.

[C.W.]: Correct.

DEFENDANT: Wow!

. . . .

18

DEFENDANT: No. Honest to God, that was not done.

[C.W.]: Yeah. In all honesty because I don't know.

DEFENDANT: It was -- it was -- that is so fuckin bad. It was, it was (inaudible). Do you understand what I mean by that?

[C.W.]: The regular way?

DEFENDANT: No baby, not the regular way, no. Like in between. Not to be inappropriate. When I say in between, just like, okay, kitchen, hot dog --

[C.W.]: Rubbing?

DEFENDANT: Right. Right. Hot dog in the bun. You understand what that is, right?

[C.W.]: Yeah but --

DEFENDANT: I hear you.

[C.W.]: Because (inaudible) that she described it.

      . . . .

DEFENDANT: Okay. And what was the description like?

[C.W.]: Rubbing and (inaudible) and shit.

DEFENDANT: What?!

      . . . .

[C.W.]: No. (Inaudible) like she need to take a pee.

19

DEFENDANT: Wow! No. No. If, shit, that had happened, that would have been force. If that would have happened, that would have been force. If that would have happened, that would have been penetrating force without a doubt. That would have been penetrable force. I'm not stupid. And when I tell you they were hot dog –

. . . .

DEFENDANT: <u>I never stuck my thing in her ass, baby. Never. Never did that shit, never. I will say as far as the hot dog bun situation, all right.</u> But that shit, I would never do that shit, baby. I never did that. I never did that shit. This is gonna cause some shit right now.

[C.W.]: Look, I don't want to be (inaudible) no more, okay? I don't. I don't want to talk about it no more.

DEFENDANT: And I'm asking you who was (inaudible). I'm begging for my freedom. I'm telling you what I did. I don't have no reason to lie after I told you what I did. I'm not gonna sit there and tell you, oh yeah –

. . . .

[C.W.]: If you didn't do anything why would you -- if you didn't do anything, why –

DEFENDANT: Baby, baby, hold on. Hold, hold, hold, hold –

[C.W.]: You told us –

DEFENDANT: Pause, pause. No. Uh-uh, no, uh-uh. I never told you that I didn't do nothing, first of all.

A-2238-21

[C.W.]: (Inaudible).

DEFENDANT: I told you. I sat there and told you.

[C.W.]: You said, you said hot dog. Okay, that doesn't -- that date?

DEFENDANT: Yeah. I told you.

. . . .

[C.W.]: This is what I don't understand, because if it wasn't -- if it wasn't done what did she have to get washed up for then for.

DEFENDANT: Why wouldn't she get washed up after doing something like that?

. . . .

[C.W.]: Why? Why would you? You're not doing nothing? You're not on her? Are you on her?

DEFENDANT: I just told you hot dog.

. . . .

DEFENDANT: She'd totally do that. I didn't have nothing to do with that. I don't have nothing to do with that. That's what her routine was. I didn't have anything to do with that.

[(Emphasis added).]

During additional telephone calls on January 21, 2018, defendant and C.W. discussed the following:

21

DEFENDANT: Actually, it wasn't even a thing of getting caught. It was a thing of she just told, that was it, and that's what started it off. And even now there's still things that I don't trust because what she told them, there's so many channels, I don't know what to think about that shit when it comes to that. But however, there was a lot that went on and was going on in my head every single day, every single day. And there was [sic] times where I wanted to actually pull her to the side and be like, look we're going to have to tell mommy. There was [sic] times when I actually wanted to tell you so bad but I didn't know how like you was gonna look at me. I didn't know how you was [sic] going to take it. I was like -- the pressure was there. The pressure was definitely there. But I didn't know how things was [sic] going to happen. I didn't know if I was gonna lose you or -- I was afraid of a lot of shit.

. . . .

DEFENDANT: There were times when I didn't have to say nothing or do nothing and she would just like come out of her clothes. Like she knew what was going on. The same way I explained to you this morning how that would happen. There were times when she would just do that like knowing that it was late at night, she's supposed to be in bed, and there were times that sitting around out of the clothes, going from there.

. . . .

DEFENDANT: So I mean there was stuff here and there, and there was little stuff going on. But I mean as far as her saying like she didn't get no attention, she got -- there was [sic] times she got more attention then [sic] versus --

. . . .

22
A-2238-21

[C.W.]: You're saying it was her choice.

DEFENDANT: Yes, yes, yes. No, I know, like I said, I admit I attempted and I told you I wouldn't lie to you and I'm not. I know that I did whatever on my end but there was [sic] things like shit was going on. And during those times it was never no, no, daddy, no mom, no nothing. I never –

[C.W.]: What happened when you finished?

DEFENDANT: Sometimes -- well most of the time she would get up, most of the time she would get up, go get washed up and she would come back, give me a hug or whatever and go to bed.

[C.W.]: Did you come on her?

DEFENDANT: On, on -- why are you asking me that?

. . . .

[C.W.]: Because I want you to tell me you did.

DEFENDANT: That's true. It was, like I said, the hot dog and stuff.

[(Emphasis added).]

On March 22, 2018, defendant again spoke with C.W. about his recent conversation with J.H.:

DEFENDANT: [W]e talked and, you know, [J.H.] told me some things.

[C.W.]: Now what did you say?

23

DEFENDANT: I said we talked and she basically told me some things and she cried and told me she apologized and everything.

     . . . .

[C.W.]: And then what happened?

DEFENDANT: I asked her, I said, how would you feel, you know, how would you feel first of all about daddy coming home? And at first she was like, she paused, she was like, I don't know, I haven't really thought about it. But then after awhile she just burst open and she was like, daddy I want you home, I need you home, like I want you to be home with me. I told her, I was like, look you know, you're going to have to -- if you really want me to come home then you got to tell these people the truth. And I asked her, I said are you willing to tell the people that everything basically was a lie or what have you? And she was like yes. And I said are you sure? And she was like yes. So I told her, I said well let mommy know because I'll call her back and I want both of you to be in the room together so we can, all three of us can talk. So I don't know if she told you that or not.

[(Emphasis added).]

During that same call, defendant explained the steps he, C.W., and J.H. would have to take to obtain his "immediate release." Defendant told C.W. to bring J.H. into the conversation so that he could tell her about the plan. When J.H. joined the telephone conversation, defendant said:

24

> You can't not pay them no attention [sic] but you can be like, look, you know, this is it. I lied, I want my attorney or whatever, and there's nothing else to tell. . . . Just the fact that -- baby, you just wanted -- I don't know -- you just wanted daddy at the house, or I don't know.

Defendant told C.W. to call his attorney and explain she wanted to "write another affidavit." Defendant stated:

> You need to tell him that you want to, you want to write another affidavit stating the facts that everything, you know, is not true and all of that. Either you can go see him or either -- I would just rather call first before you go because you're going to eventually have to go anyway. <u>But let him know, you know that basically what we talked about, you know, about the stuff that came out that's a lie and all that and that you want me released, you want me, all charges dropped, or what have you</u>. I'm pretty sure he's gonna tell you the guidelines on what you need to do and what not to do. And like I said, don't talk to no detectives. Don't talk to nobody [sic] besides my attorney. And let him, let him tell you what you need to do from there. If you can, get in contact with him ASAP, as soon as possible.
>
> [(Emphasis added).]

After this telephone call, C.W. spoke with defendant's attorney.

The next day, defendant and C.W. spoke again. C.W. said she spoke with defense counsel and he wanted to meet J.H. In discussing what J.H. might say to his attorney, defendant explained it would not be a good idea for J.H. to say she lied to authorities because she was not "getting attention."

On March 27, 2018, defendant spoke with J.H. exclusively. Defendant accused her of telling "a lot of lies." Defendant asked J.H. if she wanted "daddy to come home," and if she would be "willing to tell the people that [she] lied?" Defendant told J.H. he "hate[d] being in this . . . cage" and "wanted [the family] to be able to move on from this."

After these telephone conversations, J.H. and C.W. each gave a CCPO investigator another statement. In her second statement, J.H. recanted her prior allegations against defendant telling the investigator that she "lied" and C.W. assisted with J.H.'s lying to the CCPO.

Next, defendant sent an April 8, 2018 letter to C.W. In that letter, defendant wrote:

> Peach baby doll, [C.W.] listen. Baby I really, really need you in my corner right now more than I ever had. I don't need you to just be my wife and companion, I need you more than ever right now to step up to the plate seriously and fight with me against these devils/prosecutors who are out to take your husband down.
>
> . . . .
>
> At this point in time I would suggest and ask of you not to cooperate at all with them and do not share anything with them at all voluntarily because they can try to pressure you even . . . you to turn on me and against me too. Do not under any conditions allow them to use you to try and pump any information out of

you about me period.  And do not voluntarily or even involuntarily, share any more information with them that we discuss at all.  And if you really have my back and are here for me as you proclaim and say that you really are and have my back all the way in this with me baby.  And don't allow them to break you or trip you up.  In other words[,] don't get caught up slipping because I really need you in my corner baby for real.

I will advise you to be very consciously discrete whenever you talk to them, whenever they call you and if they ask you anything keep your answers simple, and I mean very short, basic, and simply.  And again[,] do not volunteer to share anything with them willingly.  So[,] if they don't ask you nothing, don't give them nothing.

. . . .

Moving on, my main concern is seriously the phone records of our conversations.  If they pull our conversations from the phone records then baby I'm done.  I confess a lot to you and it was always being recorded, the operator even let's you know that the call is being recorded before you press one to accept the call.

. . . .

I was seriously (indiscernible) stuck in between a rock and a hard place during that time and I felt that if I had a critical decision that I had to make, which was to go against the grain and break all codes by answering your questions and being completely honest with you or risk forever losing you because I wouldn't share with you the answers to the questions that you wanted to know.

27

. . . .

> [C.W.] if you really want to see your husband, touch your husband, hold your husband, and have him hold you as you said that you want my hands and arms to do then I need you to work with me and together let's bring your baby home. <u>I just need for you to deliver and come through on your end and stay positive (indiscernible). Please don't disappoint me</u> babe, you are still the only one that I have close in my life, I really need all your love, help and support. I love you eternally for life Ms. [C.W.]
>
> [(Emphasis added).]

K.H. testified at defendant's trial. According to her testimony, K.H. noticed defendant and J.H. spend time together in the marital bedroom with the door closed. K.H. further testified J.H. told her that defendant "would touch her in places she didn't want to be touched." K.H. also testified that one time, when she "was sick," she "went in the living room and [J.H. and defendant] didn't have clothes on." Shortly after that incident, K.H. told her school friends what she witnessed in the living room between J.H. and defendant.

Defendant proceeded to trial on the following charges: second-degree sexual assault, N.J.S.A. 2C:14-2(b) (counts one and two); second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a)(1) (counts three and eight); first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(1) (counts four, five, six, and seven); first-degree aggravated sexual assault, N.J.S.A.

2C:14-2(a)(2)(a) (counts nine, ten, eleven, twelve, fourteen, fifteen, sixteen, and seventeen); third-degree aggravated sexual contact, N.J.S.A. 2C:14-3(a) (counts thirteen and eighteen); second-degree sexual assault, N.J.S.A. 2C:14-2(c)(1) (counts nineteen, twenty, twenty-one, and twenty-two); and third-degree tampering with witnesses and informants, N.J.S.A. 2C:28-5(a) (count twenty-three).

A nine-day trial was held on non-consecutive days between August 23, 2021 and September 3, 2021. After the close of the State's case, defendant moved for a judgment of acquittal, and the judge dismissed counts four and seven. The jury found defendant guilty on all remaining counts.

Defendant was sentenced on January 28, 2022. On count five, first-degree aggravated sexual assault, the judge sentenced defendant to a fifty-year term of imprisonment, with an eighty-five percent period of parole ineligibility under the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. The judge imposed the sentence on counts one, two, three, six, eight, nine, ten, eleven, twelve, thirteen, fourteen, fifteen, sixteen, seventeen, eighteen, nineteen, twenty, twenty-one, and twenty-two concurrently to the sentence imposed on count five. On count twenty-three, third-degree witness tampering, the judge imposed a five-year term of imprisonment, consecutively to the sentence imposed on count five.

In his counseled brief on appeal, defendant raises the following arguments:

POINT I

THE TRIAL COURT IMPROPERLY ADMITTED THE COMPLAINANT'S HEARSAY STATEMENTS ABOUT THE ALLEGATIONS TO DR. FINKLE UNDER N.J.R.E. 803(c)(4). (Partially Raised Below)

A. The trial court committed plain error by admitting Dr. Finkle's testimony under N.J.R.E. 803(c)(4) without any proof that J.H. subjectively believed that her statements to Dr. Finkle were for the purpose of medical diagnosis or treatment. (Not Raised Below)

B. The trial court erred by admitting hearsay testimony that did not reasonably pertain to medical diagnosis or treatment. (Partially Raised Below)

POINT II

THE TRIAL COURT'S UNBALANCED REDACTIONS OF DEFENDANT'S LETTERS AND JAIL CALLS VIOLATED THE DOCTRINE OF COMPLETENESS AND REQUIRES REVERSAL OF DEFENDANT'S CONVICTIONS.

A. The redactions.

B. The trial court violated the doctrine of completeness by redacting defendant's statements about weaknesses in the State's case and other context necessary to evaluate defendant's mental state and relationship with his wife.

30

POINT III

> THE TRIAL COURT ABUSED ITS DISCRETION IN ADMITTING FRESH COMPLAINT TESTIMONY WITHOUT HOLDING A HEARING UNDER N.J.R.E. 104.

POINT IV

> THE TRIAL COURT ERRED IN REFUSING TO TAILOR THE JURY INSTRUCTIONS FOR ANAL INTERCOURSE.

POINT V

> THE CUMULATIVE EFFECT OF THE ERRORS REQUIRES REVERSAL. (Not Raised Below)

POINT VI

> RESENTENCING IS REQUIRED BECAUSE THE TRIAL COURT DOUBLE-COUNTED ELEMENTS OF THE OFFENSES TO SUPPORT AGGRAVATING FACTOR ONE AND INAPPROPRIATELY ALLOWED ITS SENSE OF MORAL OUTRAGE TO COLOR THE SENTENCING DECISION.

In his pro se letter brief defendant raises the following argument, which

we renumber for the reader's convenience:

[POINT VII]

> DEFENDANT CONTENDS THAT HE WILL NOT BE ABLE TO RECEIVE A FAIR AND IMPARTIAL TRIAL OR HEARING IN FRONT OF [THE TRIAL JUDGE] DUE TO THE CONFLICT OF INTEREST OF HIS ACTIONS, DEMEANOR[,] AND TONE OF

VOICE HAD ME TO BELIEVE THAT[] HE DID NOT FOLLOW THE RULES OF LAW.

I.

We first address defendant's contention that the judge erred in permitting Dr. Finkle to testify regarding statements J.H. made to him. Defendant asserts the statements "had nothing to do with medical diagnosis or treatment," and thus, should not have been admitted. He also argues Dr. Finkle's testimony "unfairly bolstered J.H.'s credibility and deprived defendant of due process and a fair trial." We reject these arguments.

Dr. Finkle was qualified as an expert in pediatrics and "the medical diagnosis [and] treatment of child abuse." He testified "[ninety] percent" of his diagnosis is based on information reported by the child during his examination. Dr. Finkle further explained he typically asks the child for details regarding the abuse prior to a physical examination, repeating "ninety-five -- ninety percent of the diagnosis again is in the history." The doctor stated his secondary purpose in examining the child "is for diagnosis and treatment of normality, wellness, signs of physical intactness. Kids commonly . . . have worries or questions or concerns about their body that they haven't shared with anybody."

Dr. Finkle also testified he seeks to learn about physical symptoms the child might have experienced during the abuse:

Okay, so I am interested hearing about how that experience felt. Focused on learning whether or not they had any injuries. Injuries while it was happening, injuries following it -- the thing. Did they notice anything, for example that may [hurt] them – someone – a child might say that it hurt. Did you notice anything that made you know you were hurt? I noticed bleeding when I wipe myself. I am interested, particularly in girls in finding out whether or not they had any discomfort afterwards when they went to the bathroom to do anything, whether or not they had dysuria, because dysuria reflects genital trauma around the structures of the urethra and what we call the vaginal vestibule which is tissues surrounding the opening to the vagina.

In addition to physical symptoms, Dr. Finkle typically explores psychological symptoms the child may report. Although Dr. Finkle acknowledged he was not a psychologist, he testified " there are a lot of details that children share about fears and anxieties that clearly have psychological impact on them and I see that the medical evaluation is one of the very first steps to therapeutic intervention."

During his examination of J.H., Dr. Finkle explained he told her:

I am a kids' doctor and one of the things I do that is a little different than most kids' doctors is I talk to kids just like you every single day, some older and some younger and they have been able to tell about something that happened that could be confusing or difficult to understand when someone they know and they trust. It happens to a lot of kids. Did that happen to you?

33

J.H. then told Dr. Finkle she "experience[d] something." When Dr. Finkle asked J.H. if she found it hard to discuss what she experienced, J.H. said "yes." Dr. Finkle testified he asked J.H. "who she thought was to blame," and she replied, "in the beginning I thought it was my fault but my mom said it wasn't . . . it was his fault." The doctor asked if the male[5] told her not to tell anyone, and she responded "yes." According to Dr. Finkle, these questions were relevant to his examination and diagnosis because "it [affects] the time frame for which the disclosure occurred . . . you are always looking to correlate physical symptoms with physical examination findings and timing. . . . And also, the risk for sexually transmitted diseases and whether or not there is a need for evaluation treatment."

Dr. Finkle also asked J.H. "if it was important to tell the doctor the truth." J.H. replied in the affirmative because the doctor would "use it to get [her] healthy again." Dr. Finkle asked J.H. about the allegations, and she shared specific details with him. Dr. Finkle recounted those details during his testimony. According to Dr. Finkle, J.H. reported specifics as to where and how

---

[5] During his trial testimony, Dr. Finkle referred to "the male" and scrupulously avoided mentioning defendant or defendant's name.

the male touched her.  J.H. also told Dr. Finkle about the physical symptoms she experienced following the sex acts with the male.

Dr. Finkle's recitation of the incidents as reported to him by J.H. were consistent with J.H.'s initial statement to the CCPO and her trial testimony. Regarding incidents of penetration, the following colloquy occurred between the prosecutor and Dr. Finkle:

> [Prosecutor]:  Did you have a chance to clarify with her what she meant when she said that he would put his penis in --
>
> Dr. Finkle:  Yes . . . She described it as feeling weird and she said that he went up and up onto my back and -- and it was white stuff, he would use a tissue and then wipe it off.
>
>    . . . .
>
> [Prosecutor]:  Doctor . . . were you able to determine by talking with [J.H.] whether or not when she mentioned that he put his penis in her butt whether it was the adult sense of penetration or something else?
>
> Dr. Finkle:  So – so she did a history of both.  Rubbing between the buttocks and the external surface of the anus.  And she also gives a history of anal penetration. And the reason of note that she experienced anal penetration into the anal rectal canal just like a bowel movement comes out, the penis goes in that space.
>
> [S]he complained that she had a burning sensation when she went to have a bowel movement afterwards. And that tells me that she had a grated tissue in what

35

we call the mucocutaneous area of the anoderm. She also gives a history of genital to genital contact.

. . . .

[Prosecutor]: And did she indicate what the male would do when he would touch his penis to her butt?

Dr. Finkle: He would put lubricant, Vaseline on it.

[Prosecutor]: Did she indicate what that felt like?

Dr. Finkle: It felt slippery and it hurt me really bad.

[Prosecutor]: And earlier you had mentioned that -- that she mentioned white stuff. Did she describe what the white stuff felt like?

Dr. Finkle: Yeah, she said it felt slimy.

[Prosecutor]: And what sensations, if any, did she report pertaining to her butt afterwards?

Dr. Finkle: Well, she complained of having runny bowels afterwards and she also complained -- I asked if it bothered her poop afterwards and she said it burned really bad when she had to have a bowel movement.

I asked her if she saw anything that made her know she was hurt when she had her poop and she said no. I asked how often this would happen as to in her butt and she said at least every time he did it. And I asked how often and she said once or twice a week.

. . . .

[Prosecutor]: Okay. So, besides this anal penetration did she report any other sexual acts?

36                                    A-2238-21

Dr. Finkle:  Complained of genital – genital contact.

.  .  .  .

Dr. Finkle:  She complained of pain.  And also, some bleeding.  In addition, there may be genital to genital contact.  And genital to genital contact the child can experience the penis placed between the labia, rubbed back and forth like this causing injury around the urethra, (indiscernible) labia without any injury to the hymen.

Now she provided a history of both genital to genital contact and that way -- and as well into the vaginal canal.

[Prosecutor]:  Thank you.  Focusing on the genital to genital contact, did [J.H.] indicate how her body would be positioned when that would happen?

Dr. Finkle:  She said in the same position, I was laying on my belly and she -- and he would go in that way.  I asked --

[Prosecutor]:  Did she indicate . . . how it felt --

Dr. Finkle:  Yes.

[Prosecutor]:  -- when that happen[ed], during?

Dr. Finkle:  She said it hurt and it felt like something was pushing up.  I ask --

[Prosecutor]:  What about -- let me ask the question.  What about sensations afterwards?

Dr. Finkle:  I asked her while or afterwards, and she said it happened while he was doing it and before.  I asked if it bothered her to do anything, she said to walk and to pee.  And she continued to pee, wouldn't come out and then it burned really bad.  I asked if she ever felt that again and she said when he would do it again, she would feel it, but not every time.

I asked if she felt the same sensation before he touched her and she said -- ever felt the same sensation before he touched her, she said yes, when I got my surgery.

.  .  .  .

[Prosecutor]:  And did she indicate if she ever had to clean herself after?

Dr. Finkle:  I asked her if she ever had to clean herself afterwards, she said my vagina.  And I asked her if she noticed anything when she would wipe herself after he touched her vagina with his private part, and she said yeah, sometimes like specks of blood and I knew it wasn't my period.

[Prosecutor]:  Did [J.H.] go on to describe any other sex acts?

Dr. Finkle:  Yes.

[Prosecutor]:  What did she describe?

Dr. Finkle:  He put his penis inside her mouth and he would move it up and down and gooey stuff would go inside of my mouth when he was done.

[Prosecutor]:  Did she indicate what it tasted like?

38

Dr. Finkle:  I asked her that and she said I never swallowed it, it was disgusting and I spit it out in the toilet and then I brushed my teeth.

[Prosecutor]:  Did she indicate how often that would happen?

Dr. Finkle:  She said about one time a week.

. . . .

[Prosecutor]:  Did [J.H.] indicate that she ever touched the male?

Dr. Finkle:  Yes.

[Prosecutor]:  What did she report?

Dr. Finkle:  She said that she had to do this and she demonstrated with her hand, moving up and down, and she said the cream would come out and go into my hand.  And she said sometimes it would be on her boobs and sometimes on my vagina.

[Prosecutor]: Did [J.H.] indicate when the last time was that something happened with the male?

Dr. Finkle:  I believe it was Thanksgiving.

[Prosecutor]:  Of the year --

Dr. Finkle:  Yes, yes --

[Prosecutor]:  -- from 2017.

Dr. Finkle:  -- Yes.

Dr. Finkle told the jury about his examination of J.H and reported he found no evidence of trauma. According to Dr. Finkle, based on the history provided to him by J.H., the absence of such evidence did not mean the abuse did not occur. In fact, Dr. Finkle opined he did not expect to find trauma based on the abuse as reported by J.H.

Defense counsel objected to Dr. Finkle's testimony at various points, arguing his statements constituted impermissible hearsay. The judge, citing N.J.R.E. 803(c)(4), overruled defense counsel's objections, finding the doctor's statements were relevant to medical treatment and diagnosis.

We review a trial judge's evidentiary rulings for abuse of discretion. State v. Garcia, 245 N.J. 412, 430 (2021) (citing State v. Nantambu, 221 N.J. 390, 402 (2015)). We "will not substitute our judgment unless the evidentiary ruling is 'so wide of the mark' that it constitutes 'a clear error in judgment.'" Ibid. (quoting State v. Medina, 242 N.J. 397, 412 (2020)). "Every mistaken evidentiary ruling, however, will not lead to a reversal of a conviction. Only those that have the clear capacity to cause an unjust result will do so." Ibid. (citing State v. Prall, 231 N.J. 567, 581 (2018); R. 2:10-2).

Hearsay is defined as a statement "(1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to

40

prove the truth of the matter asserted in the statement."  N.J.R.E. 801(c).

Hearsay is inadmissible evidence unless it falls within an applicable exception.

N.J.R.E. 802.

"[I]t has long been the rule in New Jersey that the declarations of a patient

as to his [or her] condition, symptoms, and feelings made to his physician for

the purpose of diagnosis or treatment are admissible in evidence as an exception

to the hearsay rule."  State v. Gonzales, 249 N.J. 612, 636 (2022) (quoting

Cestero v. Ferrara, 57 N.J. 497, 501 (1971)).  This exception is "based on the

assumption that the declarant is more interested in obtaining a diagnosis and

treatment culminating in a medical recovery than he is in obtaining a favorable

medical opinion culminating in a legal recovery."  Biunno, Weissbard & Zegas,

Current N.J. Rules of Evidence, cmt. on N.J.R.E. 803(c)(4) (2024-25).

Under N.J.R.E. 803(c)(4), a hearsay statement is admissible provided it

"is made in good faith for purposes of, and is reasonably pertinent to, medical

diagnosis or treatment"; and "describes medical history; past or present

symptoms or sensations; their inception; or their general cause."  "[T]o be

admissible[,] the patient must have believed that the statement would enable the

doctor to treat [him or her]," because "[r]eliability is based on the declarant's

belief that a doctor will properly treat him [or her] if the doctor is told the truth

concerning the ailment." In re C.A., 201 N.J. Super. 28, 33-34 (App. Div. 1985). However, a statement by someone who "is unaware that his or her statements will enable a physician to make a diagnosis and administer treatment" does not possess the same trustworthiness to qualify under this exception. R.S. v. Knighton, 125 N.J. 79, 87-88 (1991).

Defendant argues the State failed to satisfy "the foundational requirement of N.J.R.E. 803(c)(4): that J.H. herself subjectively believed her statements to Dr. Finkle were for the purpose of medical diagnosis or treatment." Because Dr. Finkle's testimony falls within the N.J.R.E. 803(c)(4) hearsay exception, we disagree.

The record reflects J.H. knew the purpose of Dr. Finkle's examination was for her to receive treatment following defendant's sexual assaults. Dr. Finkle used the information reported by J.H. to conduct his examination and make further treatment recommendations. J.H. also understood the information she imparted to Dr. Finkle was for the purpose of getting her "healthy again." We are satisfied Dr. Finkle's statements during his testimony were made for the purpose of medical treatment and diagnosis in accordance with N.J.R.E. 803(c)(4). Thus, the judge did not err in ruling the doctor's statements were admissible.

42

Defendant also argues Dr. Finkle improperly provided the jury with "statements that had nothing to do with medical diagnosis or treatment." Specifically, defendant challenges Dr. Finkle's testimony that J.H. "thought it was her own fault for the abuse happening," "J.H. was afraid that if she disclosed the abuse she would be taken away from her mother and no one would believe her," and "J.H. told her younger sister about the abuse."

Having reviewed the record, we are satisfied these statements related to "past or present symptoms or sensations; their inception; or their general cause." N.J.R.E. 803(c)(4)(B). Dr. Finkle explained that details pertaining to the abuse allegations were necessary because those details delineated how he would conduct the examination and if further testing or treatment would be required. While Dr. Finkle admitted he was not a psychologist, he explained his concern that psychological symptoms, such as guilt or fear, displayed by a child could affect the child's retelling of events. Those concerns would impact Dr. Finkle's physical examination of the child and his opinion about whether further therapeutic intervention should be recommended.

Even if we were to agree that Dr. Finkle's testimony was impermissible under N.J.R.E. 803(c)(4), which we do not, there was overwhelming evidence supporting the jury's guilty verdict. In addition to J.H.'s detailed and persuasive

testimony, the jury heard defendant's sperm was found on J.H.'s underwear. The jury also considered defendant's telephone calls and letters to his family, which contained admissions of his wrongdoing. Further, K.H. witnessed inappropriate behavior between defendant and J.H. on at least one occasion. On this record, even if the judge's admission of Dr. Finkle's testimony had been erroneous, any error was harmless as it was not "clearly capable of producing an unjust result," requiring reversal of defendant's convictions. R. 2:10-2.

## II.

Defendant next argues the judge's redactions of his letters and telephone calls to his family were "unbalanced" and "violated the doctrine of completeness." Defendant focuses on the redactions to a December 26, 2017 telephone call, and the April 8 and 9, 2018 letters. We reject his arguments regarding this issue.

Prior to trial, the State requested redaction of the December 26, 2017 telephone call between defendant and C.W. to exclude the portion of their conversation regarding C.W.'s removal of defendant's name from certain marital documents and bills. Defense counsel argued the entire conversation between C.W. and defendant was required under the completeness doctrine to give context to "the nature of relationship" between husband and wife as of that date.

Further, defense counsel asserted the redacted information was essential for the jury to assess "credibility as well as understand the context of the witness tampering charge."

In rendering a ruling on the State's requested redaction, the judge stated:

> [Defense counsel], I hear your objection, under [N.J.R.E.] 403, you know we're trying a case of aggravated sexual assault and endangering a child, I just feel that that wasn't really part of the discussion under [N.J.R.E.] 403(a), it could lead to confusion issues and/or mislead the jury, and I do see going forward certainly there is no memorialization on the end of the relationship. The reason why is [sic] also seems to be defined here by [defendant].
>
> So, I'm going to grant the State's application [for certain redactions].

At trial, the State requested redaction of portions of defendant's April 8, 2018 letter. Specifically, the State sought to redact references to defendant's perception of the prosecution's motives and trial strategy, and defendant's opinion that the State's case was "weak." The State argued those portions of the letter were "inaccurate" and would be confusing for the jury.

Defense counsel countered the State's proposed redactions were "highly probative to the mens rea of the witness tampering charge." Defense counsel argued "defendant's subjective belief of the strength of his case goes directly towards the witness tampering" charge.

45

The judge granted the State's requested redactions. The judge found defendant "talk[ed] about legal strategy," "talk[ed] about the prosecutor" and "under [N.J.R.E.] 403 that . . . is confusing, it's misleading." The judge also found the statements were "improper" and "prejudicial."

Later in the trial, defense counsel requested redaction of the following portion of defendant's April 9, 2018 letter: "And they will definitely use the phone records to beyond a doubt prove that they have evidence. . . . So basically I, myself, alone would really be fucked." Defense counsel argued:

> It's misleading to the jury and would potentially confuse them and paint a picture that [defendant] believes that his ship has sunk, even though he repeatedly throughout this entire letter and the other letters clearly indicate that he believes he has a good shot of winning at trial. So, only introducing evidence that he thinks he is going to lose from a legal perspective, a [m]otion to [s]uppress, is wholly improper and completely misleading.

In response, the State argued the statement represented "classic consciousness of guilt" and was admissible. The judge agreed and denied defense counsel's requested redaction.

Under N.J.R.E. 106, codifying the doctrine of testimonial completeness, "[i]f a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part, or any other

46

writing or recorded statement, that in fairness ought to be considered at the same time." A "second writing may be required to be read if it is necessary to (1) explain the admitted portion, (2) place the admitted portion in context, (3) avoid misleading the trier of fact, or (4) insure a fair and impartial understanding." State v. Lozada, 257 N.J. Super. 260, 272 (App. Div. 1992) (quoting United States v. Soures, 736 F.2d 87, 91 (3d Cir. 1984)).

The purpose of the rule is to permit the trier of fact to hear all that was said at that time about the same subject matter. State v. Gomez, 246 N.J. Super. 209, 217 (App. Div. 1991). Unrelated portions of the statement are not admissible under a theory of "completeness." Ibid.; see also State v. James, 144 N.J. 538, 555 (1996) (holding that the doctrine of completeness does not apply to "separate utterances").

In Gomez, we concluded the defendant's exculpatory statement, which followed an inculpatory statement, was not admissible under the doctrine of completeness because the second statement was not necessary to explain the first. 246 N.J. Super. at 221. Moreover, the doctrine will not form a basis to admit any self-serving parts of a statement, as self-serving statements are hearsay not within any exception. Id. at 215-17.

Whether or not the doctrine of completeness applies in a particular instance is an evidentiary determination which we review for abuse of discretion. State v. Brown, 170 N.J. 138, 147 (2000). On this record, we are satisfied the judge did not abuse his discretion regarding the redactions to defendant's telephone call and letters.

Here, defendant's statements about the weaknesses in the State's case were not necessary to explain the other admitted portions of defendant's letter. Nor were those statements required to place the admitted portions of the letter in context. Additionally, the redacted statements were not needed to avoid misleading the jury. Nor were they required to ensure a fair and impartial understanding of the admitted portions of defendant's letter. Thus, the judge properly determined defendant's legal opinions in his letters to C.W. were wholly irrelevant to the defense of his case and could potentially confuse the jury.

Similarly, the conversation between C.W. and defendant regarding C.W.'s decision to remove defendant's name from their insurance policy and other household documents was not required to explain the rest of their telephone communication or demonstrate defendant's state of mind at the time. We are satisfied the redacted information from defendant's telephone call was irrelevant

48

and unnecessary to defendant's case. Therefore, the judge did not abuse his discretion in redacting the telephone call.

III.

Defendant next argues the judge erred by admitting fresh complaint testimony without conducting a Rule 104 hearing.

During jury selection, defense counsel requested a hearing under N.J.R.E. 104 if the State intended to admit fresh complaint testimony as referenced in the pretrial memo because the State had not filed a motion or requested a hearing. At that time, the State had not made a decision on the issue. Thus, the judge stated he would address the issue at a later time.

The issue arose when J.H. testified she told K.H. about defendant's abuse. Defense counsel objected, arguing "we're getting into [f]resh [c]omplaint territory." Defense counsel asserted J.H.'s testimony that "she talked with her sister . . . immediately after the incident" was "hearsay." The State responded it was "allowed to elicit [f]resh [c]omplaint testimony to show that [J.H.] disclosed [the abuse] to someone." The judge ruled the testimony was "admissible as a present sense impression under N.J.R.E. 803(c)(1), an excited utterance under 803(c)(2)," and permitted the State to continue questioning J.H.

J.H. testified she told K.H. about the abuse "[a] few hours" after the incident because K.H. asked. J.H. explained K.H. was seven years old at the time and described K.H.'s reaction as "kind of surprised, but, honestly, she probably wasn't." J.H. told the jury she spoke to K.H. approximately five times about defendant's sexual abuse because K.H. "always asked about it." J.H. explained she would get emotional and cry when talking to K.H. about the assaults.

After a break in J.H.'s testimony, defense counsel moved for a mistrial. He argued a Rule 104 hearing was required prior to admitting J.H.'s "fresh complaint" testimony. Because there was no Rule 104 hearing, defense counsel argued "a mistrial [was] appropriate." The judge denied defendant's motion because only the victim had testified at that point and fresh complaint testimony is proffered by a person other than the victim.

However, during K.H.'s testimony, the State elicited the following brief exchange:

> [Prosecutor]: Did [J.H.] ever tell you what she and [defendant] would do in there while the door was closed?
>
> [K.H.]: Yes.
>
> [Prosecutor]: What did she tell you?

[K.H.]: That he would touch her in places she didn't want to be touched in.

[Prosecutor]: Did [J.H.] talk to you about that more than once?

[K.H.]: Yes.

[Prosecutor]: Did she say it happened more than once?

[K.H.]: Yes.

[Prosecutor]: When she would talk to you about that how would she look to you?

[K.H.]: She would break down and start crying.

Defense counsel did not renew his objection after K.H. testified.

Defendant now argues that "[t]he trial court abused its discretion in admitting this fresh complaint testimony without holding an N.J.R.E. 104(a) hearing." Defendant contends that had a hearing been held, "the trial court could have appropriately defined parameters as to how this hearsay would be presented to the jury, so that the testimony did not exceed the limited purpose of fresh complaint evidence."

The fresh complaint doctrine is a common-law exception to the rule against hearsay. State v. C.W.H., 465 N.J. Super. 574, 599-600 (App. Div. 2021). It "allows witnesses in a criminal trial to testify to a victim's complaint of sexual assault." Id. at 599 (quoting State v. Hill, 121 N.J. 150, 151 (1990)).

51

"[T]o qualify as fresh complaint evidence, the victim's statement must have been made spontaneously and voluntarily, within a reasonable time after the alleged assault, to a person the victim would ordinarily turn to for support." State v. R.K., 220 N.J. 444, 455 (2015).

"[F]resh complaint evidence serves a narrow purpose. It allows the State to negate the inference that the victim was not sexually assaulted because of her silence." Hill, 121 N.J. at 163. "[T]he purpose of the rule is to prove only that the alleged victim complained, not to corroborate the specifics of the victim's allegations." State v. P.H., 178 N.J. 378, 393 (2004) (quoting State v. Bethune, 121 N.J. 137, 146 (1990)).

In this case, J.H.'s testimony did not constitute fresh complaint evidence. Fresh complaint testimony "allows witnesses in a criminal trial to testify to a victim's complaint of sexual assault." Hill, 121 N.J. at 151 (emphasis added). Here, J.H. was the victim. She testified at trial and was subject to cross-examination concerning her testimony that she told K.H. about defendant's sexual assaults. Thus, the judge did not err in declining to conduct a Rule 104 hearing regarding statements that J.H. made to K.H.

However, K.H.'s testimony fell within the parameters of fresh complaint evidence. While the judge should have conducted a Rule 104 hearing regarding

the admissibility and parameters of K.H.'s testimony, any error was harmless considering the totality of the evidence against defendant in this case. K.H.'s testimony regarding her conversations with J.H. about defendant's sexual assaults was brief. Moreover, K.H. did not provide specific details regarding her discussions with J.H. about the abuse. In fact, the most significant part of K.H.'s testimony was her role as an eyewitness to inappropriate conduct between defendant and J.H.

Additionally, as we stated previously, there was overwhelming other evidence of defendant's guilt, including his jail house communications with C.W. and DNA evidence. Thus, even if K.H.'s single line of testimony regarding her conversation with J.H. regarding the sexual assaults should have been excluded, the admission of K.H.'s testimony was not clearly capable of producing an unjust result.

Moreover, largely tracking the Model Jury Charge[6] in his final charge, the judge properly instructed the jury regarding "fresh complaint" evidence. The judge told the jury "[t]he only reason that the evidence [was] permitted [was] to negate the inference that J.H. failed to confide in anyone about the sexual

---

[6] See Model Jury Charges (Criminal), "Fresh Complaint" (rev. Feb. 5, 2007).

offense" and "[a] fresh complaint is not evidence that the sexual offense actually

occurred or that J.H. is credible."  The judge expressly instructed

> this testimony was permitted for a limited purpose.  The
> making of a complaint is not an element of the offense.
> Proof that a complaint was made is neither proof that
> the sexual offenses occurred nor proof that J.H. was
> truthful.  It merely dispels any negative inference that
> may arise from her assumed silence.  It eliminates any
> negative inference that her claims of having been
> sexually assaulted are false because of her assumed
> failure to have confided in anyone about the sexual
> offenses.

We presume the jury followed the court's instructions.  See State v. Vega-

Larregui, 246 N.J. 94, 126 (2021).  Having reviewed the entire record, we are

satisfied the judge did not err in admitting the testimony of J.H. and K.H.

regarding J.H.'s disclosure of the defendant's sexual assaults to K.H.

IV.

We next consider defendant's argument "the trial court erred in refusing

to tailor the jury instructions for anal intercourse."  We disagree.

During the charge conference, defense counsel requested the inclusion of

the following language regarding anal intercourse:  "Insertion of the penis in the

left and right buttocks does not constitute anal intercourse."  The State objected,

urging the judge to follow the Model Jury Charge which provides: "anal

intercourse is penetration of any depth into the anus."

54                                                          A-2238-21

The judge, agreeing with the State's position, stated:

> I'm going to follow the Model Jury Charge. I understand, [defense counsel's] argument, and I do think it's the, somewhat, lynchpin of the case, sir, so I would say I'm giving you the short shrift, but I think the Model Charge is the way to go here in that particular matter. And I think the charge, the facts, we'll have their testimony, based on the Model Charge. How you argue that in summation is something else, but I'm not going to change the Model Charge, so you understand my reasoning.

During summation, the prosecutor argued:

> The defendant – for something to be some penetration, there has to be some type of force. "I'm not stupid; I know the damn law well." The defendant does not know the damn law well. He freely admitted to oral, and oral is penetration. He thinks that it's just vaginal or anal is penetration. Oral is penetration. Hot dog bun. In between the outer lips of the vagina, as [the judge] will instruct you, that's penetration. That's vaginal intercourse. He admits to touching. He admits to feeling, her touching me, oral, hot dog bun. The last two are penetration.

Following the State's closing argument, defense counsel moved for a mistrial. He argued the prosecutor's representation that "hot dog bun equals penetration" was legally flawed because "that does not constitute [anal] intercourse." The State countered its reference to "hot dog in a bun" during summation related to defendant placing his penis "between the lips of [J.H.'s]

55

vagina."  The judge denied defendant's mistrial motion, reiterating he would provide the Model Jury Charge to the jury.

As to counts twelve, seventeen, and twenty-two, alleging defendant had anal intercourse with J.H., the judge instructed the jury:

> In order for you to find [defendant] guilty of this charge, the State must prove the following elements beyond a reasonable doubt.  One, the defendant committed an act of sexual penetration with J.H. . . .
>
> The first element the State must prove beyond a reasonable doubt is that the defendant committed an act of sexual penetration with J.H.  According to the law, anal intercourse constitutes sexual penetration.  Any amount of insertion, however slight, constitutes penetration.  That is, the depth of insertion is not relevant.  The definition of anal intercourse is penetration, however slight, into the anus.

"Appropriate and proper charges to a jury are essential for a fair trial." State v. Carrero, 229 N.J. 118, 127 (2017) (quoting State v. Daniels, 224 N.J. 168, 180 (2016)).  In charging a jury, a "trial court must give 'a comprehensible explanation of the questions that the jury must determine, including the law of the case applicable to the facts that the jury may find.'"  State v. Baum, 224 N.J. 147, 159 (2016) (quoting State v. Green, 86 N.J. 281, 287-88 (1981)).  "[B]ecause correct jury charges are especially critical in guiding deliberations in criminal matters, improper instructions on material issues are presumed to

constitute reversible error." State v. Jenkins, 178 N.J. 347, 361 (2004). "The test to be applied . . . is whether the charge as a whole is misleading, or sets forth accurately and fairly the controlling principles of law." Baum, 224 N.J. at 159 (quoting State v. Jackmon, 305 N.J. Super. 274, 299 (App. Div. 1997)).

"[A] jury charge is presumed to be proper when it tracks the model jury charge because the process to adopt model jury charges is 'comprehensive and thorough.'" State v. Cotto, 471 N.J. Super. 489, 543 (App. Div. 2022) (quoting State v. R.B., 183 N.J. 308, 325 (2005)). "Ordinarily, the better practice is to mold the instruction in a manner that explains the law to the jury in the context of the material facts of the case." State v. Concepcion, 111 N.J. 373, 379 (1988). "However, there is no principle requiring that in every case a court must deliver a specifically tailored instruction relating the facts of the case to the applicable law." State v. T.C., 347 N.J. Super. 219, 240 (App. Div. 2002). Accordingly, "not every failure [to tailor jury instructions] is fatal." Cotto, 471 N.J. Super. at 544 (alteration in original) (citing State v. Tierney, 356 N.J. Super. 468, 482 (App. Div. 2003)).

Defendant argues the judge deprived him "of due process and a fair trial in refusing to provide tailored jury instructions on anal intercourse given the facts of this case." Defendant, relying on State v. Gallagher, 286 N.J. Super. 1,

13-15 (App. Div. 1995), contends a tailored instruction was necessary because "slightly penetrating between the two cheeks does not constitute anal penetration."

Here, the judge followed the Model Jury Charge, which provides: "The definition of 'anal intercourse' is penetration, however slight, into the anus." Model Jury Charges (Criminal), "Aggravated Sexual Assault Victim At Least 13 But Less Than 16 (N.J.S.A. 2C:14-2a(2))" (rev. Mar. 10, 2018) (emphasis added). In Gallagher, we found the trial court erred in charging the jury that "insertion of the penis into the crevice formed by the left and right buttocks to any degree" constituted penetration. 286 N.J. Super. at 13. The Model Jury Charge in its present form was drafted based on our holding in Gallagher. By following the Model Jury Charge verbatim, the judge did not err in declining to tailor the charge regarding anal intercourse.

Moreover, based on our review of the record, the State's closing arguments did not discuss anal intercourse when the prosecutor referred to defendant's "hot dog bun" comment. Rather, that portion of the State's summation addressed vaginal intercourse. In the context of vaginal intercourse, sexual penetration includes penile penetration of the outer area of the vaginal opening. State v. J.A., 337 N.J. Super. 114, 115 (App. Div. 2001).

Even if we agreed that State's comments during summation were improper, which we do not, the judge also provided the following jury instruction:

> Arguments and the statements or remarks, openings and summations of counsel are not evidence and must not be treated as evidence. Although the attorneys may point out what they think important in this case, you must rely solely on your understanding and recollections of the evidence that was admitted during the trial.
>
> Whether or not the defendant has been proven guilty beyond a reasonable doubt is for you to determine based on all of the evidence presented during the trial. Any comments by counsel are not controlling. It is your sworn duty to arrive at a just conclusion after considering all of the evidence which was presented during the course of the trial.

Further, as we previously stated, the evidence against defendant was overwhelming. Based on the record as a whole, we discern no error in the judge's jury instructions or the judge's denial of defendant's request for a mistrial based on certain comments during the State's summation.

V.

We reject defendant's argument that cumulative errors during the course of his trial warranted reversal of his convictions. "[E]ven when an individual error or series of errors does not rise to reversible error, when considered in

combination, their cumulative effect can cast sufficient doubt on a verdict to require reversal." State v. Jenewicz, 193 N.J. 440, 473 (2008). "Where the aggregation of legal errors renders a trial unfair, a new trial is required." State v. T.J.M., 220 N.J. 220, 238 (2015). However, this principle does not apply "where no error was prejudicial and the trial was fair." Ibid. (quoting State v. Weaver, 219 N.J. 131, 155 (2014)).

Defendant failed to demonstrate any error or pattern of errors, rising to the level, either singly or cumulatively, that denied him a fair trial. "A defendant is entitled to a fair trial but not a perfect one." State v. R.B., 183 N.J. 308, 334 (2005) (quoting Lutwak v. United States, 344 U.S. 604, 619 (1953)).

VI.

In the event we decline to reverse defendant's convictions, he argues in the alternative that resentencing is required because the court "double-counted elements of the offenses to support aggravating factor one and inappropriately allowed its sense of moral outrage to color the sentencing decision." We disagree.

As for aggravating factor one, the nature and circumstances of the offense, the judge stated:

> [The jury] found that [defendant] had consistently
> sexually assaulted his stepdaughter. The [j]ury found

60

that his conduct started in June of 2015 when she was eleven years old and continued through November of 2017. This [j]ury found that this defendant repeatedly raped her vaginally, anally, forced her to perform fellatio against her will for a period of twenty-nine months until, ironically, the end of November, Thanksgiving weekend of 2017. The [j]ury agreed with the State that defendant caused this nightmare and hell for this young girl who had looked to this defendant for trust and guidance in her life as her parental influence.

Nightmares are supposed to end; but [J.H.] indicates in her statement that [they have] not . . . .

I remember one point in the trial the court staff had to direct me to [J.H.] who was faced down on the stand, crying after she recounted the torture inflicted on her by this defendant. We all listened to the tapes, the phone calls that defendant knew were taped where he attempted to force the mother of his child, as well as the child he abused for twenty-nine months, to recant abuse. [J.H.] is a woman of courage and this is her day where she should be acknowledged for overcoming the horror she went through. I'm putting him away forever.

. . . .

Certainly, aggravating factor one applies. This sexual abuse started at age [eleven]. She was playing doctor with her two other sisters and this predator took her from a game of love and innocence into his own marital bedroom and began to sexually abuse her. I give aggravating [factor one] heavy weight.

We review sentencing determinations under a deferential standard. State v. O'Donnell, 117 N.J. 210, 215 (1989). We will disturb a sentence only in the

61

following circumstances: where the sentencing guidelines were not followed, the aggravating and mitigating factors found by the judge were unsupported by the evidence, or the judge's application of the sentencing guidelines rendered the sentence clearly unreasonable. State v. Roth, 95 N.J. 334, 364-65 (1984). Under this deferential standard, only when the facts and law show "such a clear error of judgment that it shocks the judicial conscience" should a sentence be modified on appeal. Id. at 363-64.

Defendant focuses his argument on the judge's application of aggravating factor one. Under that factor, the sentencing judge "reviews the severity of the defendant's crime, 'the single most important factor in the sentencing process,' assessing the degree to which defendant's conduct has threatened the safety of its direct victims and the public." State v. Fuentes, 217 N.J. 57, 74 (2014) (quoting State v. Lawless, 214 N.J. 594, 609 (2013)). This analysis "must be premised upon factors independent of the elements of the crime and firmly grounded in the record." Id. at 63.

In appropriate cases, "a sentencing court may justify the application of aggravating factor one, without double-counting, by reference to the extraordinary brutality involved in an offense." Fuentes, 217 N.J. at 75 (citing O'Donnell, 117 N.J. at 217). "A sentencing court may consider 'aggravating

facts showing that [a] defendant's behavior extended to the extreme reaches of the prohibited behavior.'" Ibid. (quoting State v. Henry, 418 N.J. Super. 481, 493 (Law Div. 2010)).

Here, we recognize the judge cited J.H.'s age and her relationship with defendant in finding aggravating factor one applied. However, these were not the sole bases for the judge's application of that aggravating factor. The judge also cited the length of the abuse, the manner of the abuse, and the effect the abuse had on J.H. and her family. On this record, we are satisfied the judge did not err in finding that aggravating factor one applied because the judge premised his findings as to this factor independent of the elements of the crime.

We also reject defendant's argument that he is entitled to resentencing "because the trial judge allowed his sense of moral outrage and indignation to overwhelm the legal process." Based on our review of the record, the judge was acutely aware of his role in sentencing. During the sentencing hearing, the judge stated:

> I'm guided by certain settled principles of law. The case law tells me that there is the need for dispassionate, even[-]handed conduct is most acute in this sentencing phase of a criminal trial because it is the critical phase of the criminal process that my role changes from the arbitrator of legal disputes which arise[] during the course of the trial to dispenser of society's justice.

. . . .

> I want to be guided exclusively by the factors which are established by law and not by my own personal code of conduct.

Here, no evidence supports defendant's assertion that the judge's "sense of moral outrage" impacted the sentence imposed. To the contrary, the record reflects the judge followed the sentencing guidelines. Additionally, the judge's findings regarding the aggravating and mitigating factors were supported by the record. Further, defendant's sentence does not "shock the judicial conscience."

## VII.

Along the same vein, in his pro se brief, defendant argues that "he [was] not . . . able to receive a fair and impartial trial or hearing in front of [the trial judge] due to the conflict of interest of his actions, demeanor[,] and tone of voice had me to believe that, he did not follow the rules of law." Having considered defendant's contentions in view of the extensive record, we conclude they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2238-21